Joseph I. LUBIN and Evelyn J. Lubin, and Estate of Joseph Eisner, Deceased, Helen Eisner, Executrix, and Helen Eisner, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 445, 446, Dockets 28804, 28805.

United States Court of Appeals
Second Circuit.

Argued May 7, 1964.

Decided July 27, 1964.

Harry J. Rudick, Mason G. Kassel, John A. Gray, New York City (Lord, Day

& Lord, New York City, of counsel), for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Joseph Kovner, Michael K. Cavanaugh, Attys., Dept. of Justice, for respondent.

Before WATERMAN and FRIENDLY, Circuit Judges, and ANDERSON, District Judge.*

WATERMAN, Circuit Judge:

We are called upon in this case to determine whether a sum of $1,000,000 realized by four taxpayers upon the retirement of twelve registered mortgage notes, a sum representing the difference between the $3,000,000 face value of the notes and the $2,000,000 which the taxpayers actually paid for them upon issuance, is to be treated for income tax purposes as ordinary income or as a capital gain. The Tax Court, T. C. Memo 1963–292, concluded that the $1,000,000 increment represents interest realized by the taxpayers upon a principal sum, and therefore has ruled that ordinary income treatment is proper and that the Commissioner's assertion of deficiencies totaling $789,161.21 should be upheld. As we are of the opinion that the taxpayers should have been accorded capital gains treatment on the increment here involved, we reverse the Tax Court.

The petitioner-taxpayers are two couples, Joseph Lubin and wife and Samuel Eisner and wife, each of whom filed joint income tax returns for the calendar year 1954.[1] At the time the transactions relevant to this appeal arose, Messrs. Lubin and Eisner were the senior partners in a New York accounting firm. In March of 1953 Lubin was approached by a broker who advised him that the stock of Sattlers, Inc., the largest department store in Buffalo, New York, and the stock of Brighton Products, Inc., the corporation which operated the store's meat department, were being offered for sale for a total price of $6,500,000. Lubin analyzed assorted financial data concerning the two corporations in question, and as a result he happily concluded that not only did the corporations have a net worth of more than $8,100,000 exclusive of good will, but also that they had been generating an annual earned income after taxes of about $700,000. This spelled out an easy and almost certain profit of more than $2,000,000 for the fortunate person or persons who would purchase the stock at the price then being asked. Lubin therefore informed the broker that he and the other taxpayers were desirous of going ahead with the purchase, they intending at that time to buy the stock, operate the department store corporations for about a year, and then sell the stock at a profit that would net them a long term capital gain.

The broker then revealed to Lubin that he was acting on behalf of a Buffalo businessman named Irving Levick who had discovered the attractive opportunity, and who, according to the broker, would have to be included among those taking advantage of it. A meeting was arranged between Lubin and Levick, at which Levick disclosed that, although he could arrange institutional financing in the amount of $4,500,000 on the strength of the assets of the two corporations to be purchased, he, Levick, did not have the additional $2,000,000 necessary to close the deal. Lubin then proposed that he and his fellow taxpayers participate in the venture and furnish the needed cash in return for a half share in the anticipated $2,000,000 profit; Levick agreed. A discussion followed as to the form the proposed transaction was to take, and Lubin made it clear to Levick that, as the Lubins and Eisners were all in very high income tax brackets, the gain to be realized by them on the deal would have to be taxable at capital gains rates. Levick rejected, however, Lubin's suggestion that he and his associates buy all of the

---

* Sitting by designation.

1. Eisner died on May 4, 1958, and his estate was made a party to these proceedings. His wife, as executrix, is therefore a party not only as a taxpayer, herself, against whom a deficiency has been asserted, but also as her deceased husband's executrix.

stock and sell it to Levick at the end of the capital gains period, Levick giving as his reason his desire to own all of the stock and hold himself out as proprietor of the companies involved from the very beginning of the venture. Lubin asserted that the petitioners were willing to cede such control to Levick at the outset as long as a capital gains tax rate could be assured for them, and, after the two negotiators agreed to formulate a plan whereby petitioners could realize a profit of $1,000,000 taxable at the desired rate, Lubin set out to investigate what sort of plan might serve this purpose.

Toward this end Lubin sought the advice of the partner in his accounting firm who was in charge of the firm's tax department, and he, relying on the decision in Commissioner v. Caulkins, 144 F.2d 482 (6 Cir. 1944), and the Commissioner's reported acquiescence in it, advised Lubin that the desired profit and capital gains treatment could be assured through the use of registered notes bearing a face value of $1,000,000 greater than the amount the taxpayers were to advance. Relying upon this advice, and upon his own reading of the authorities cited to him by his partner, Lubin decided to go ahead with the venture on this basis. Accordingly, Lubin and Levick quickly set into operation a series of arrangements designed to carry out the plan. A corporation owned by Levick and his associates named Seneca Warehouse & Industrial Center, Inc. (hereinafter Seneca) organized a wholly owned subsidiary, Associated Investors, Inc., for the purpose of acquiring the stock of the sought-for department store corporations. The petitioners then advanced $2,000,000 to Seneca, Seneca made this amount available to Associated Investors, Inc., and Associated Investors, Inc. combined this money with $4,500,000 it had raised through institutional financing and purchased the stock of the Buffalo department store corporations. In consideration for their advance of the $2,000,000 Lubin and the other petitioners received

from Seneca twelve registered mortgage notes having face amounts of $250,000 each, totaling in full $3,000,000 and dated June 29, 1953.[2] The face amount of each note was payable as follows: $187,500 on January 4, 1954, or a little more than six months after issuance, and $5,208.33 on the fourth day of each month thereafter until January 4, 1955. The notes by their terms also provided for payment of interest at the rate of two per cent per annum on face value. Sometime after January 4, 1954 all of the notes were paid off in full, together with an additional sum of $4,458.25 that was paid on each note representing the agreed-upon two per cent interest charge, and the petitioners all reported as ordinary income on their 1954 federal returns the amounts so received by them as such interest. The petitioners all reported as long term capital gains, however, the amounts received in payment of the face value of each note which exceeded the sum the petitioners originally advanced to the obligor, an excess which, combined for all of them, was exactly $1,000,000. The Commissioner, alleging that these increments were taxable as ordinary income as to each of the taxpayers, asserted deficiencies against them for the calendar year 1954. The Tax Court sustained the Commissioner. That Court ruled that the $1,000,000 realized by the petitioning taxpayers through the above described transaction was but interest paid the taxpayers by Seneca for the use of the $2,000,000 which had been utilized in purchasing the stock of the two department stores. On this appeal, the taxpayers argue that the Tax Court erred in characterizing the amount in controversy as interest, and that capital gains treatment is therefore called for under Section 1232(a) (1) of the 1954 Code; as an alternative argument taxpayers claim that the Commissioner is foreclosed from asserting the alleged deficiencies against them because of his acquiescence in Commissioner v. Caulkins, supra, which was of record at the time the taxpayers en-

2. Four notes were issued to Lubin and four were issued to his wife; two notes were issued to Eisner, and two were issued to his wife.

tered into the transactions which gave rise to the controversy. We need not discuss taxpayers' latter argument (though we do note that this court's recent decision in Dixon v. United States, 333 F.2d 1016 (2 Cir. 1964), relying on Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 183, 77 S.Ct. 707, 709, 1 L.Ed.2d 746 (1957), is very strong authority for rejecting it) for we agree with taxpayers that, apart from any reliance they may have placed upon the Caulkins decision, they are entitled to capital gains treatment under Section 1232(a) (1) of the 1954 Code.

■ Section 1232(a) (1), which controls as to the gain here involved, provides that, in the case of bonds or other evidences of indebtedness which are capital assets in the hands of a taxpayer, "[a]mounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954)."[3] Language identical in all material respects with that used in Section 1232(a) (1) was considered in the 1944 case of Commissioner v. Caulkins, supra, and the court in that case interpreted Section 117(f) of the 1939 Code, the forerunner of Section 1232(a) (1), so as to require capital gains treatment as a matter of law for all amounts received upon the redemption of a bond. The Caulkins decision stood as authority for a number of years, but recent consideration of the problem presented in that

case, primarily in the light of an examination of the legislative history of Section 117(f) of the 1939 Code, has led to its express rejection by four Courts of Appeals, including our own. Dixon v. United States, supra; United States v. Harrison, 304 F.2d 835 (5 Cir. 1962), cert. denied, 372 U.S. 934, 83 S.Ct. 881, 9 L.Ed.2d 765 (1963); Rosen v. United States, 288 F.2d 658 (3 Cir. 1961); Commissioner v. Morgan, 272 F.2d 936 (9 Cir. 1959). See also Jaglom v. Commissioner, 303 F.2d 847 (2 Cir. 1962), where this Court held that the portion of the sales price of bonds which represented unpaid interest that had accrued on them prior to sale was to be taxed as ordinary income. We regard these cases as clear authority for the proposition that Caulkins was erroneously decided and ought now to be regarded as dead and buried, but we cannot agree with the Commissioner, who relies upon them, that these cases require us to rule with the Tax Court that the amount in controversy here must be taxed as ordinary income. As we read the Dixon, Mason, Rosen, and Harrison decisions, they lay down the very sound rule that, despite a contrary inference which might be drawn from too literal a reading of the language of Section 1232(a) (1), taxation at ordinary income rates is proper where a sum paid upon the retirement of a bond or note in fact represents interest for the use of the money represented by the principal of the certificates of indebtedness. Unlike the situations which obtained in the cited cases where the increments representing an excess of face value over original cost were relatively small, increased regularly year by year, and were clearly interest equivalents,[4] in the situ-

---

3. Section 1232(a) (2) of the 1954 Code now clearly provides that a gain such as the one realized by these taxpayers is to be taxed as ordinary income. Section 1232(a) (2) applies, however, only to bonds or other evidences of indebtedness issued after December 31, 1954, and the notes we are concerned with here were issued one and one-half years before that date, on June 29, 1953.

4. Under the terms of the notes in the case at bar, three-quarters of the face value was payable in just over six months and the remaining one-quarter was payable in equal monthly payments over the course of the next twelve months. Since the face value of the notes exceeded their cost by 50%, if the excess of face value over original cost were to be considered as interest, the

ation before us the extra amounts received upon retirement of the registered notes did not represent interest but represented the note holders' share in profits realized through the purchase of undervalued stock.

■■ In determining how to characterize the gain in this case, the statement from Deputy v. Du Pont, 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416 (1940), that " 'interest on indebtedness' means compensation for the use or forbearance of money," while useful as a starting point, is not dispositive of the issue before us, nor can it be. The Commissioner would have us rule that anything above face value paid on notes by an obligor must, as a matter of law, be regarded as interest, no matter what the substance might be of the underlying transaction which has given rise to the obligations. Of course this approach runs directly counter to the admonition laid down in Old Colony R. R. Co. v. Commissioner, 284 U.S. 552, 561, 52 S.Ct. 211, 214, 76 L.Ed. 484 (1932), and later adopted in Deputy v. Du Pont, supra, itself, 308 U.S. at 498, 60 S.Ct. at 368, that the term "interest" when used by Congress is to be construed according to "the usual, ordinary, and everyday meaning of the term" and not according to "some esoteric concept derived from subtle and theoretic analysis." As this Court stated in Dixon v. United States, supra, 333 at 1016, after having completed an analysis purposed toward reducing the transactions underlying the obligations there involved "to their essentials": "It would seem arbitrary to insist, as do the taxpayers, that significant tax consequences should hinge upon whether this * * * sum is separately stated as interest or is included in the face amount of the note. It has been repeatedly emphasized that our taxing statutes are intended to take cognizance of realities and not mere appearances or facades." In the present case it would seem that the Commissioner arbitrarily has refused to take cognizance of the realities of the transaction, and we think it reasonable that what was said in Dixon should apply to the Commissioner with the same force as to taxpayers.

■ Of course, when reduced to their essentials, the transactions which gave rise to the issuance of these notes did not comprehend that the increment of $1,000,000 was interest for the use by the obligor of petitioners' money. It is undeniable that the petitioners' business venture was predicated from the very start upon their right to share, on an equal basis with the Buffalo businessman Levick, a proposed $2,000,000 profit to be derived from the purchase of stock which was being undervalued by the seller. Their original plan, once they learned of the need for Levick's participation, was to acquire the stock with a contract to sell it to Levick or the corporation at a profit of $1,000,000 after the passage of sufficient time to assure them of capital gains treatment. The substance of the transaction is not changed simply because they cast the deal in the form of registered notes in order to accommodate Levick who desired to be known from the time of original purchase as the owner. As the Code does not require a profit realized in this form to be treated as interest, and as the evidence relating to the substance of the transaction afforded no basis upon which the Tax Court could have concluded that these profits were interest payments, we hold that § 1232(a)(1) should be applied in accordance with its terms so that petitioners will be taxed at capital gains rates.

Reversed.

"interest" charge would figure out to be well in excess of 75% per year and this rate would be charged for money used to consummate a deal where all parties agreed that there was almost no risk at all involved.