*Decisions will be entered under Rule 50.*

TED BOLNICK AND BERTHA BOLNICK, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3503–62. Filed May 28, 1965.

---

*Samuel P. Halpern* and *Joseph L. Abrahamson*, for the petitioners.
*Paul G. Wilson*, for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in income tax for the taxable year 1954 in the amount of $3,535.89.

There are two issues for decision:

(1) Whether gain realized in 1954 by petitioner Ted Bolnick upon the redemption at face value, by the issuers prior to maturity, of debentures issued in registered form by certain corporations to petitioner at an original issue discount in 1953, constitutes long-term capital gain or ordinary income.

(2) Whether petitioners are entitled to an overpayment of income tax paid for the taxable year 1954 in the amount of $778.90, which overpayment they claimed on their Federal income tax return for that year.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners were husband and wife residing in Los Angeles, Calif., during the taxable year 1954. They filed a joint Federal income tax return for the taxable year 1954 with the district director of internal revenue, Los Angeles, Calif. They reported taxable income by the cash method of accounting. Hereafter, Ted Bolnick will be referred to as petitioner.

During 1954, petitioner was an employee of West Valley Publishing Co., Tarzana, Calif. He was also a self-employed investment counselor and an investor.

On April 8, 1953, petitioner purchased from Alto Building Corp. (hereafter referred to as Alto), for the sum of $21,770, 61 debentures, numbered 1 through 61, each having a face value of $500, and each bearing stated interest at the rate of 2 percent per annum, payable in semiannual installments commencing October 15, 1953. The debentures were due and payable at face value on April 15, 1959, and were in registered form. On or about April 15, 1953 (the date of issue), all

of the debentures were registered in the records of Alto in the name of petitioner.

On April 10, 1953, petitioner purchased from Black Construction Co. (hereafter referred to as Black), the issuer thereof, for the sum of $9,282, 26 debentures, numbered 1 through 26, each having a face value of $500, and each bearing stated interest at the rate of 2 percent per annum, payable in semiannual installments commencing October 15, 1953. The debentures were due and payable at face value on April 15, 1959. On or about April 15, 1953 (the date of issue), all of the debentures were registered in the records of Black in the name of petitioner.

On May 15, 1953, petitioner purchased from De Soto Park Estates (hereafter referred to as De Soto) the issuer thereof, for the sum of $9,000, 30 debentures, numbered 31 through 60, each having a face value of $500, and each bearing stated interest at the rate of 2 percent per annum, payable in semiannual installments commencing November 15, 1953. The debentures were due and payable at face value on May 15, 1961, and were in registered form. On or about May 15, 1953 (the date of issue thereof), all of the debentures were registered in the records of De Soto in the name of petitioner.

Alto, Black, and De Soto were incorporated under the laws of California in March or April 1953. Daniel E. Cohn (hereafter referred to as Cohn) and his brother were the principal stockholders, officers, and directors of the three corporations which were formed to develop subdivisions and to construct and sell houses. Cohn, who was engaged in the business of building and selling homes, formed other corporations to build houses in the same subdivisions where Alto, Black, and De Soto were engaged in building and selling houses. These other corporations, as did Alto, Black, and De Soto, issued debentures at original issue discount, to selected investors who were known to Cohn's attorney, Robert K. Light (hereafter referred to as Light), or who were known to Light's clients.

Light made a study of what he deemed to be the relevant law and determined that if Cohn's corporations issued registered debentures at an original issue discount, any gain realized by holders of the debentures upon maturity would constitute capital gain to them.

Petitioner heard through a friend that Alto, Black, and De Soto were to issue debentures at an original issue discount and that the debentures would bear interest to maturity at the rate of 2 percent per annum on the principal amount. Petitioner's friend, who was also investing in debentures of Cohn's corporations, put petitioner in touch with Light. Petitioner was advised by Light that any gain which he might realize upon maturity of such debentures, issued at an original issue discount, would constitute capital gain to him. He considered that the stated interest rate would not compensate him for the risks inherent in investing in such debentures of corporations engaged in the

business of building and selling houses, but he felt that the discount, which he would realize upon maturity as capital gain, plus the stated interest, would justify the risks. On one occasion, petitioner and Light visited the subdivision where Alto, Black, and De Soto were to build houses. Petitioner discussed the debentures generally with Light, but neither Light nor Cohn indicated to petitioner that any debentures which petitioner might purchase from Alto, Black, and De Soto would be redeemed prior to maturity. Petitioner hoped that the debentures might be redeemed prior to maturity, but he did not expect or anticipate that they would be, and no representations were made to him in this regard. There was no understanding between petitioner and any representative of Alto, Black, or De Soto that the debentures would be redeemed prior to the dates of maturity as stated.

Each of the debentures issued by Alto, Black, and De Soto provided that no salaries or compensation of any kind was to be paid to officers, directors, or stockholders of the corporations without the prior written consent of the registered holders of 100 percent of the outstanding debentures.

Alto, Black, and De Soto paid interest at the rate of 2 percent per annum on the face amounts of the debentures as called for therein. Petitioner reported such interest as ordinary income, and the amounts thereof are not involved herein.

Except as the holder of debentures, acquired as set forth above, petitioner was at no time financially interested in Alto, Black, or De Soto. Petitioner was not acquainted with Cohn prior to his purchase of these debentures.

Cohn's corporations, including Alto, Black, and De Soto, were successful, and Cohn, who desired to be paid compensation by his corporations and to cause the corporations to be dissolved, decided to have the corporations offer to redeem the outstanding debentures from the holders thereof.

On July 7, 1954, Light, on behalf of Alto, made a written offer to redeem petitioner's debentures of Alto as of August 1, 1954, at face amount; on July 8, 1954, he made a written offer on behalf of Black to redeem petitioner's debentures of Black as of August 1, 1954, at face amount; and on August 5, 1954, he made a written offer on behalf of De Soto to redeem petitioner's debentures of De Soto as of September 1, 1954, at face amount. In each of these written offers, petitioner was advised that he had the privilege of holding the debentures until stated maturity. Petitioner accepted each of the offers, and the corporations redeemed at face amount the debentures which he held.

In petitioner's Federal income tax return for 1954, petitioner reported the gains realized upon redemption of the debentures of Alto, Black, and De Soto as long-term capital gain in the total amount of $18,441. He reported that the gains upon redemption of the Alto, Black, and

De Soto debentures were in the amounts of $8,723, $3,718, and $6,000, respectively. In the determination of the deficiency here involved, respondent determined such gains to be ordinary income.

Petitioner's Federal income tax return for 1954 reported tax due for the year (including self-employment tax) to be in the amount of $2,451.10; income tax withheld by his employer to be in the amount of $480; and payments on 1954 declaration of estimated tax to be in the amount of $2,750. He therefore reported an overpayment of income tax for the taxable year in the amount of $778.90. Petitioner indicated in the return for 1954 that this amount of $778.90 was to be refunded to petitioners.

Upon examination of petitioners' 1954 return, the examining officer made certain adjustments to petitioners' taxable income as reported. Petitioners agreed to these adjustments, which are not involved in the present controversy, and paid the amount of $1,064.43 as additional income tax for the year 1954.

In the statutory notice which respondent issued to petitioners herein, dated on or about June 8, 1962, respondent determined that petitioners' income tax liability for the taxable year 1954 was in the amount of $7,051.42, that the income tax liability reported by petitioners in their 1954 return was in the amount of $2,451.10, and that petitioners paid additional income tax for the year 1954 in the amount of $1,064.43, resulting in a deficiency in the amount of $3,535.89.

In the fall of 1955, petitioners' accountant conferred with an internal revenue agent concerning adjustments to petitioners' income tax liability as reported for 1953 and 1954. These adjustments are not involved herein. At this time petitioners had not received a refund of the $778.90 overpayment shown on their return for 1954. After the conference, petitioners' accountant believed that refund of the overpayment claimed was being delayed pending settlement of their liability for 1953 and 1954.

After filing their return for 1954, petitioners moved to a residence different from that indicated on their return for 1954. On April 6, 1956, petitioners' accountant wrote the "Collector of Internal Revenue, Los Angeles 12, California," advising that petitioners had never received payment of the refund in the amount of $778.90 and advising also that petitioners had a new address which was indicated in the letter. The evidence does not indicate whether this letter was ever received by the district director of internal revenue, Los Angeles.

On May 8, 1959, an examining officer submitted his report with respect to petitioners' income tax liability for the year 1954. He proposed certain adjustments to taxable income as reported. These adjustments resulted in a deficiency. As noted above, petitioners agreed to certain adjustments and to the payment of a portion of the deficiency. The examining officer checked the records of the office of the

district director and determined that a refund check in the amount of $778.90 had been issued to petitioners. He took this amount into account in determining the deficiency resulting from the agreed adjustments, which totaled $1,064.43. Petitioner paid the amount of $1,064.43 on or about June 3, 1960, but demand for the amount was later made by the district director.

On July 26, 1960, petitioner wrote the district director, informing his office that petitioners had received the notice of the assessment of the amount of $1,064.43, which had been forwarded to their address which was shown in the letter, and explaining that petitioners had paid the amount. Petitioner also stated that petitioners had never received payment or credit of the claimed refund of $778.90, and requested a detailed statement of computation of the assessment of $1,064.43.

Petitioners protested to the appellate division certain adjustments proposed by the examining officer. This protest and conferences with the appellate division culminated in the notice of deficiency here involved. Petitioners' protest was considered by technical advisers of the appellate division over a period of time. Petitioner conferred on several occasions with these technical advisers. At each conference, petitioner stated repeatedly that petitioners had never received payment or credit of their refund in the amount of $778.90. On each occasion, it was explained to petitioner that the office of the district director of internal revenue had jurisdiction over the matter of the refund.

Petitioner contacted various employees in the office of the district director of internal revenue about the refund of $778.90 while the appellate division was considering his protest. The matter was never settled. Finally, on May 7, 1962, petitioner contacted an employee in the office of the district director whose duty it was to consider such matters as petitioners' failure to receive the refund check for 1954. This employee checked the records of the district director and determined that a refund check had been issued on June 2, 1955. She advised petitioner to file a prescribed form certifying that petitioners had not received the check. The employee realized that it had been more than 6 years since the check was purportedly issued, but she considered that if the check had not been negotiated, petitioners might still receive it.

On June 5, 1962, petitioners' accountant filed a Form 843, claim for refund, claiming refund of $778.90 for the taxable year 1954, although he considered that petitioners' return for the taxable year 1954 constituted a claim for the refund.

On February 7, 1963, an official of the General Accounting Office advised petitioners by letter that their claim for the proceeds of a Government check in the amount of $778.90 was disallowed because the claim was barred by the provisions of 31 U.S.C. sec. 122, as amended Pub. L. 85–183, sec. 3(a), 71 Stat. 465 (Aug. 28, 1957).

CONCLUSIONS OF FACT

At the time of issuance of the debentures here involved, the issuers had no specific intent to redeem the debentures prior to maturity, and there was no understanding between the issuers and petitioners that the debentures would be redeemed as soon as the real estate developments which they financed were completed and marketed, or at any other time prior to maturity.

Petitioners did not receive a check from the Government in the amount of $778.90 in payment of the overpayment shown to be due on their return for 1954, nor did they receive the proceeds thereof.

OPINION

*Issue 1. Unearned Original Issue Discount—Ordinary Income or Capital Gain*

Petitioner contends that he is entitled to treat as long-term capital gains the gains which he realized in 1954 upon the redemption by Alto, Black, and De Soto of the debentures which these corporations had issued to petitioner in 1953 at an original issue discount. Respondent has determined that the gains which petitioner realized upon the redemptions constitute ordinary income.

Petitioner relies upon the provisions of section 1232(a)(1), I.R.C. 1954,[1] set forth in the margin. This section, which is the successor in the 1954 Code to section 117(f), I.R.C. 1939, provides, *inter alia*, that amounts received by the holder upon retirement of debentures or other evidences of indebtedness issued in registered form by a corporation prior to January 1, 1955, "shall be considered as amounts received in exchange therefor," if the debentures are capital assets in the hands of the taxpayer.

It is clear from the evidence that the debentures in question were bona fide evidences of indebtedness issued by the corporations Alto, Black, and De Soto in registered form in 1953. Further, respondent does not controvert that the debentures were capital assets in the hands of petitioner;[2] or that the debentures were "retired." Cf. *Warner A. Shattuck*, 25 T.C. 416 (1955).

---

[1] SEC. 1232. BONDS AND OTHER EVIDENCES OF INDEBTEDNESS.

(a) GENERAL RULE.—For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer; and which are issued by any corporation, or government or political subdivision thereof—

(1) RETIREMENT.—Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954).

[2] It has been stipulated that one of petitioner's occupations in 1954 was that of "investor." We think it is clear from petitioner's testimony that he purchased the debentures for investment and not for sale to customers in the ordinary course of a trade or business.

But respondent maintains that petitioner's gains realized in 1954 were attributable to original issue discount; that such original issue discount is essentially interest and, as such, constitutes ordinary income; and that the provisions of section 1232(a)(1) do not serve to transmute this ordinary income into capital gain, despite the statutory provision that the amounts received by petitioner upon redemption of the debentures are to be deemed to be amounts received by petitioner "in exchange therefor."

Since briefs were filed herein, the Supreme Court has decided the case of *United States* v. *Midland-Ross*, 381 U.S. 54 (May 3, 1965). In that case the taxpayer purchased non-interest-bearing notes issued by corporations at an original issue discount. Prior to maturity but after holding the notes for longer than 6 months, the taxpayer sold the notes for less than face amounts but at a price in excess of the issue price. The taxpayer thus realized gains on the sales. The issue was whether these gains were taxable as long-term capital gains or ordinary income. It was conceded that the gain in that case was the economic equivalent of interest for the use of the money to the date of the sale. The Court held that the *earned* original issue discount which was involved in that case, being the equivalent of interest, or compensation for the use or forbearance of money, see *Deputy* v. *du Pont*, 308 U.S. 488 (1940), was not entitled to capital gains treatment under the 1939 Code but was to be taxed as ordinary income. In doing so the Court apparently laid to rest the argument based on the decision of both this Court[3] and the Court of Appeals for the Sixth Circuit in *Commissioner* v. *Caulkins*, 144 F. 2d 482 (1944), affirming 1 T.C. 656 (1943), that under section 117(f) of the 1939 Code amounts received by the holder upon retirement of debentures were unsusceptible of partition and hence the entire amount of original issue discount received upon retirement was capital gain. In the *Midland-Ross* opinion the Supreme Court concluded that all Congress intended to do in enacting section 117(f) of the 1939 Code was to equate "retirement" with "sale or exchange" so that gain on retirement of evidences of indebtedness might receive capital gains treatment, but that the amount received on the sale of the promissory notes there involved could be allocated between its component parts and that the increment attributable to interest was taxable as ordinary income. However, the Court specifically refused to pass on the tax treatment under the 1939 Code of a ratable portion of the original issue discount which might properly be attributable to fluctuations in the interest rate and market price of obligations.[4]

---

[3] Petitioner, in his briefs filed before the Supreme Court decided *United States* v. *Midland-Ross*, 381 U.S. 54 (May 3, 1965), relies primarily on *George Peck Caulkins*, 1 T.C. 656 (1943), affd. 144 F. 2d 482 (C.A. 6, 1944). This Court, however, specifically declined to follow *Caulkins* in *Richard B. Gibbons*, 37 T.C. 569 (1961).

[4] See fn. 4 to *United States* v. *Midland-Ross*, *supra*.

We believe the decision in *United States* v. *Midland-Ross, supra*, requires the conclusion here that that portion of the original issue discount received by petitioner upon redemption of the debentures which is attributable to interest earned to the date of retirement is taxable as ordinary income. But we do not understand it to answer the additional question we have here whether a portion of the original issue discount which may not be attributable to earned interest is entitled to capital gains treatment. In fact we find no case which appears to answer this question under the 1939 Code.[5]

The closest case in point is *V. David Leavin*, 37 T.C. 766 (1961). The facts therein are very similar to the facts in this case. Taxpayers invested in registered debentures bearing interest at 2 percent per annum. The debentures were issued in the face amount of $500 prior to January 1, 1955. They were acquired by taxpayers from the issuers at discounts in excess of 25 percent. Each debenture provided for a maturity date 6 years from the date of original issue, but all of the debentures were redeemed at "face" prior to maturity. However, unlike the situation here, it was stipulated in *Leavin* that at the time of the issuing of the debentures, it was the intention of the issuing corporations to redeem the debentures used to finance the development of a specific tract as soon as it was completed and the houses constructed thereon had been sold, even though the debentures had not then matured; and that the owners of the debentures knew of said intention.

In the opinion in the *Leavin* case, this Court recognized that the fact that the debentures were redeemed, or retired, by the issuer did not, per se, accord capital gains treatment to the entire amount of the gain, and that insofar as the redemption at "face" included recovery of the original issue discount attributable to the period during which the debentures were actually outstanding (assuming the total discount was to be amortized over the 6 years to maturity of the debentures), such ratable amount was interest and taxable as ordinary income. However, we also recognized that a part of the gains might be attributable to something other than interest, such as a premium paid for premature relinquishment of the obligation, which is not considered to be interest. See, e.g., *District Bond Co.*, 1 T.C. 837 (1943). But, in view of the fact that both the debentureholders and the issu-

---

[5] The question is specifically answered under sec. 1232(a)(2) of the 1954 Code, but that provision applies only to bonds or other evidences of indebtedness issued after Dec. 31, 1954. See S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 436 (1954). Most of the cases heretofore decided involved either redemptions at maturity, e.g., *Commissioner* v. *Morgan*, 272 F. 2d 936 (C.A. 9, 1959), reversing 30 T.C. 881 (1958); *Rosen* v. *United States*, 288 F. 2d 658 (C.A. 3, 1961); *Arnold A. Schwartz*, 40 T.C. 191 (1963); *Richard B. Gibbons, supra*; or situations in which the evidences of indebtedness were redeemed or sold for amounts representing the issue price plus the earned portion of the discount, e.g., *Pattiz* v. *United States*, 311 F. 2d 947 (Ct. Cl. 1963); *Jaglom* v. *Commissioner*, 303 F. 2d 847 (C.A. 2, 1962), affirming 36 T.C. 126 (1961); none of which involved the unearned portion of original issue discount.

ers understood from the outset that actual redemption of the debentures at "face" would take place as soon as the issuer had marketed the project for which the debentures provided financing, we concluded that the essential nature of the entire original issue discount there involved was interest or money paid for the use of money and that realization of this amount upon redemption of the debentures gave rise to ordinary income. In doing so, however, we specifically declined to "pass on a case in which no prior understanding exists with respect to early redemption."

We have found as a fact from all the evidence in this case that at the time of the issuance of the debentures in this case there was no specific intent on the part of the issuers and certainly no understanding between petitioner and the issuers that the debentures would be redeemed at face value prior to maturity. Consequently, our decision in *Leavin* is not controlling here, except to the extent that the original issue discount can ratably be apportioned to the period during which the debentures were actually outstanding, assuming the discount should be amortized over the period from date of issue to maturity. To that extent we find that the discount represented interest or compensation for the use of money and the allocable portion of the discount recovered is taxable as ordinary income.

Our conclusion of fact above is based primarily on the evidence that petitioner did not know the Cohn brothers, who were the officers and stockholders of the issuing corporations, before he bought these debentures, he had not dealt with them before, he had no interest in these projects other than as a debentureholder, he was not told by anyone that the debentures would be redeemed prior to maturity, and there was no provision for early redemption in the debentures. Further, both Daniel Cohn and Robert Light, the Cohns' attorney who devised this plan of financing and interested petitioner therein, and both of whom were called as witnesses by respondent, testified that they did not know petitioner before these transactions, that this type of project and financing was a new venture for the Cohns and they had no specific intention at the time of issuance of the bonds to redeem them prior to maturity, and that they neither intimated to nor assured petitioner that the debentures would be redeemed prior to maturity. Both of these witnesses testified that the issuers offered to redeem the bonds after the projects had been completed and marketed because the Cohns needed cash for their own purposes and, under the terms of the debentures, could draw no cash from the issuing corporations, even in the form of salaries, while the bonds were outstanding. The letter sent to petitioner offering to redeem the debentures early pointed out that petitioner had the right to hold the debentures to maturity. Petitioner testified that he was advised by Light that his gain on recovery of the discount would be capital gain and that this was one of the

reasons he was willing to invest in such a risky venture at such a low stated rate of interest, and that he hoped the debentures would be redeemed early, but that he was not told by anyone that the issuers intended to redeem them prior to maturity or even that such might be the case.

There is no evidence in this record to support respondent's contention that it was understood at the time of issuance that these debentures would be redeemed prior to maturity if the projects proved to be successful. Of course it could be assumed, because of the tax and other advantages to both parties, that the debentures might be redeemed early if the projects proved successful, but it might also be assumed that the issuers of the debentures might want to use the funds provided by these debentures for other ventures until the debentures matured. In any event, we must decide the facts on the evidence presented and that requires the conclusion stated above.

This leaves open the question whether the gain resulting from the recovery of the balance of the discount is taxable as ordinary income or capital gain. In deciding this question we must first look to sections 1232(a)(1), 1222, and 1202 of the 1954 Code. Section 1232 (a)(1) provides generally that in the case of debentures which are capital assets in the hands of the taxpayer (which these admittedly were), amounts received by the holder on retirement of such debentures shall be considered as amounts received in exchange therefor. Sections 1202 and 1222 provide generally that gains received on the sale or exchange of capital assets held for more than 6 months are entitled to long-term capital gains treatment. We know from *United States* v. *Midland-Ross, supra,* that section 1232(a)(1) does not require that the entire amount received on redemption of the debentures be considered as received in exchange for the debentures themselves if in fact a part of it represents a payment for something else, such as interest. We also know from that decision that the ratable portion received in exchange for earned [6] original issue discount is not entitled to capital gains treatment because it is not received in exchange for a capital asset, the *earned* original issue discount serving the same function as stated interest, concededly ordinary income and not a capital asset. But except to the extent of that portion of the amount received on redemption which is properly attributable to something other than the debentures themselves, we believe section 1232(a)(1) requires that it be considered as received in exchange for the debentures and hence is taxable as capital gain.

---

[6] We note that in the opinion of the Supreme Court in the companion case *Dixon* v. *United States,* 381 U.S. 68 (May 3, 1965), the Court says: "Our holding today in *Midland-Ross* that original issue discount is not entitled to capital gains treatment * * *." But in view of the consistent references in the *Midland-Ross* opinion to *earned* original issue discount, and the footnotes thereto, we attach no particular significance to the omission of the word "earned" in the quotation above from the *Dixon* case.

Absent an intention on the part of the issuer at the time the debentures were issued to redeem the debentures before maturity, which intention was understood or reasonably should have been understood by the purchaser, we do not believe the portion of the discount that was unearned at the date of redemption served the same function as interest, or represented "income items or accretions to the value of a capital asset themselves properly attributable to income." See *United States* v. *Midland-Ross, supra.* The entire amount of the discount was not intended or understood to be compensation for the use of the money paid in for the debentures for the shortened period of time. It is difficult to say just what the amount representing the unearned portion of the discount was paid for. A part of it could be said to have been paid for the privilege of retiring the debentures before maturity, or a part of it might be said to represent a share of the profit realized on a successful venture, equivalent to the return on liquidation of risk capital.[7] But absent some compelling reason to liken it to ordinary income, we need not characterize it specifically because section 1232(a) (1) does characterize it as amounts received in exchange for the debentures, and hence capital gain.

This conclusion does not do violence to the concept of limiting capital gains treatment to "situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year." *Commissioner* v. *Gillette Motor Co.*, 364 U.S. 130, 134 (1960). Petitioner received a return of his investment plus a gain sooner than he expected due to the fortuitous circumstance that the projects were completed and marketed successfully earlier than expected and the issuers wanted to get their money out for other uses as soon as possible. Such circumstances often produce appreciation in value of assets which, if held for more than 6 months before realization of the gain, produce long-term capital gains.

As noted in *V. David Leavin, supra,* this conclusion is also in accord with section 1232(a) (2) of the 1954 Code, as amended by section 50(a) of the Technical Amendments Act of 1958 (Pub. L. 85–866, Sept. 2, 1958). While section 1232(a) (2) is not applicable to these debentures, it does evidence congressional recognition of the distinction between the situation in which there is no plan for early redemption and that in which there is an understanding that the debentures will be redeemed prior to maturity. See S. Rept. No. 1983, 85th Cong., 2d Sess., p. 76 (1958), 1958–3 C.B. 922, and H. Rept. No. 775, 85th Cong., 1st Sess., p. 30 (1957), 1958–3 C.B. 811.

Finally, we note that respondent does not argue on brief that our opinion in *Leavin* was incorrect in suggesting the differentiation which

---

[7] See *Lubin* v. *Commissioner,* 335 F. 2d 209 (C.A. 2, 1964), reversing a Memorandum Opinion of this Court.

we order herein; respondent merely argues that petitioner understood, when he purchased the debentures, that they would be redeemed prior to maturity and that the facts of this case are indistinguishable from those in *Leavin.*

We conclude that that portion of petitioner's gain realized upon redemption of the debentures allocable to the period during which petitioner actually held the debentures, assuming a ratable allocation of the entire original issue discount over the period from the date of issue to the date of maturity of the debentures, is taxable as ordinary income and that the balance of the gain is taxable as long-term capital gain.    The parties can make the proper allocation in the Rule 50 computations.

Petitioners argue that respondent is estopped to maintain in this case that any portion of their gain represents ordinary income.   Their contention, which is not based upon pleadings properly framed, rests upon the fact that respondent's acquiescence in *George Peck Caulkins*, 1 T.C. 656 (1943), affd. 144 F. 2d 482 (C.A. 6, 1944), was in effect when the debentures in question were issued.   This contention is conclusively answered in the negative by the decision of the Supreme Court in *Dixon* v. *United States*, 381 U.S. 68 (May 3, 1965).

### *Issue 2.   Overpayment of Tax*

The second issue is concerned with whether petitioners are entitled to an overpayment of income tax for the taxable year 1954 representing an amount which is the excess of payments on their declaration of estimated tax for the year 1954, plus an amount paid by withholding, over the amount of income tax liability reported by them on their return for that year.

It is undisputed that, for the taxable year 1954, petitioners paid estimated tax in the total amount of $2,750, and that the amount of $480 was paid by withholding.   Petitioners, for 1954, reported total payments of income tax to be in the total amount of $3,230; they reported their income tax liability for the year 1954 to be in the amount of $2,451.10.   Thus, they reported an overpayment of income tax in the amount of $778.90.   They indicated in their 1954 return that this amount of $778.90 was to be refunded to them and that the amount was not to be credited to their estimated income tax for the subsequent taxable year.

By amendment to their petition, petitioners have prayed that this Court award judgment in their favor against the United States and against the Commissioner of Internal Revenue in the amount of $778.90 with interest thereon at the rate of 6 percent per annum from March 15, 1955.

We have no jurisdiction to grant the relief which petitioners seek; we have no authority to award a judgment.   *Commissioner* v. *Gooch*

*Co.*, 320 U.S. 418 (1943). Our jurisdiction is precisely circumscribed by statute and we can only determine the amount of a deficiency or of an overpayment in income tax—or of both—for the taxable year for which respondent has determined a deficiency. Sec. 6512(b), I.R.C. 1954. But in determining the amount of an overpayment, albeit for the same year for which we may determine a deficiency, we are to take into account payments made by the taxpayer by withholding and by payments on declaration of estimated tax, and if the total of such payments exceeds income tax liability for the year in controversy, we are to determine an overpayment. *Ernest J. Keefe*, 15 T.C. 947 (1950).

We therefore treat petitioners' prayer in the amended petition as a claim for overpayment in income tax for the taxable year 1954.

Petitioners maintain and have offered evidence that they have never received refund of the amount of $778.90 for the taxable year 1954. Respondent has proved that a refund check was issued in favor of petitioners, but we are convinced by petitioners' evidence that such a check was never received by them. Respondent has offered no evidence that such a refund check was actually delivered to petitioners or that it was ever cashed by petitioners or by anybody else. Apparently, the check was destroyed prior to the hearing. Respondent has adduced no secondary evidence of its negotiation and payment, and it appears from the testimony of one of respondent's witnesses that respondent's records show only that the check was issued.

Respondent, in this posture of the case, argues that petitioners are not entitled to the overpayment which they seek because their claim for overpayment is barred by reason of the statute of limitations for which provision was made in 31 U.S.C. sec. 122, Act of June 22, 1926, sec. 2, 44 Stat. 761, as follows:

All claims on account of any check, checks, warrant, or warrants appearing to have been paid shall be barred if not presented to the General Accounting Office within six years after 'the date of issuance of the check, checks, warrant, or warrants involved. * * *

Respondent relies upon the provisions of 31 U.S.C. sec. 122 as set forth above. However, this statutory provision was amended August 28, 1957, Pub. L. 85–183, sec. 3(a), 71 Stat. 465, and presently provides:

Hereafter all claims on account of any check, checks, warrant, or warrants appearing from the records of the General Accounting Office or the Treasury Department to have been paid, shall be barred if not presented to the General Accounting Office or the Treasurer of the United States within six years after the date of issuance of the check, checks, warrant, or warrants involved. * * *

The evidence shows that, according to the records of the district director of internal revenue, the refund check in question was issued in favor of petitioners on June 2, 1955, prior to the effective date of the enactment of Pub. L. 85–183, 71 Stat. 465, but that the 6-year statutory

period for the presentation of a claim on a check issued by the Government did not expire until after the date of enactment of the amendment to 31 U.S.C. sec. 122. The parties cite us to no authority construing the phrase, "appearing to have been paid," in the original version of 31 U.S.C. sec. 122, or to authorities construing the phrase in the statute as amended, "appearing from the records of the General Accounting Office or the Treasury Department to have been paid." But, in any event, we cannot conclude from the record herein that the check appears to have been paid, even if we deem the records of the district director of internal revenue to be those of the Treasury Department. The records of the district director of internal revenue indicate at most that the check was issued, and an employee of respondent, who caused the records to be examined when petitioner made inquiry about his refund, testified that after the records were checked, she proceeded on the assumption that the check had not been negotiated. We therefore have serious doubts that the provisions of 31 U.S.C. sec. 122 would be operative in the instant case even if we held that petitioners were making a claim herein on account of a Government check. But we need not definitely decide whether the check appears to have been paid, or whether, if it was paid, petitioners' persistent representations to respondent's officers and employees constituted an informal claim presented to the Treasury Department, in view of our conclusions below.

For we conclude that petitioners are not making claim in this proceeding on account of a check issued by the Government; they are simply asserting that they made certain payments of income tax for the year 1954 in excess of their tax liability. Of course, we cannot determine that petitioners "paid" the amount in question if it has been repaid them; but if it be presumed that the refund check was delivered to petitioners in the ordinary course of delivery of the mails, cf. *Parrish* v. *United States*, an unreported case (W.D. Mo. 1958, 2 A.F.T.R. 2d 5656, 58–2 U.S.T.C. par. 9727), we would be compelled to find that petitioners have rebutted the presumption by evidence that they did not receive the check. This conclusion is particularly clear in the light of the evidence that petitioners moved from the address listed on their return for 1954 shortly after filing the return, and we have no indication from the record that a Government check would be forwarded to their new residence in the course of delivery of the mails.

Finding that petitioners "paid" the amounts in controversy, we turn to the statutory provisions governing determination of an overpayment.

Section 6401(b), I.R.C. 1954, provides that the excess of the amount allowable as a credit under section 31, relating to income tax withheld at the source, over the income tax liability for the taxable year shall

be treated as an overpayment. Furthermore, it is recognized in Treasury regulations that payments on a declaration of estimated tax for a taxable year can result in an overpayment for the taxable year. Sec. 301.6402–4, Proced. and Admin. Regs. If the taxpayer's payments on a declaration of estimated tax, plus the amount properly to be credited as amounts withheld at the source, exceed income tax liability for the taxable year, the result is an overpayment for purposes of section 6402, and proper claim for refund of such an overpayment can be made by the taxpayer by indicating on his return for the taxable year that he desires refund of the overpayment. Sec. 301.6402–3, Proced. and Admin. Regs.

Petitioners indicated on their return for the taxable year 1954, which was timely filed, that they desired refund of the overpayment which resulted from the fact that payments on their declaration of estimated tax, plus amounts credited by withholding, exceeded their tax liability as reported. Respondent does not contend otherwise.

As we have noted, this Court has jurisdiction to determine the amount of the overpayment, which, as we have seen, includes the excess of current tax payments for the year 1954 over petitioners' income tax liability for that year. It remains only to be determined that the amount of $778.90, which petitioners contend must be taken into account in determining an overpayment, constitutes an overpayment of income tax within the purview of section 6512(b), I.R.C. 1954, a provision which prescribes the limits of our jurisdiction to determine an overpayment.

By the provisions of section 6512(b)(2),[8] we can determine that the amount of $778.90 is to be taken into account in determining an overpayment if we find that a timely claim for refund for the amount could have been filed (whether or not it was in fact filed) on the date that the statutory notice of deficiency was mailed. Here, petitioners could have filed a claim for refund which would have been timely under section 6511 if it had been filed on the date that the notice was mailed. It is immaterial that they did so. Cf. sec. 6512(b)(2)(C), as amended, sec. 4, Pub. L. 87–870 (Oct. 24, 1962). It follows that we have jurisdiction to determine that the amount of $778.90 is to be taken into account in determining the amount of an overpayment upon a Rule 50 recomputation. See *Ernest J. Keefe, supra.*

Petitioners are not asserting a cause of action based, directly or indirectly, on account of a check issued by the Government; their

---

[8] SEC. 6512(b)(2). Limit on Amount of Credit or Refund.—No such credit or refund shall be allowed or made of any portion of the tax unless the Tax Court determines as part of its decision that such portion was paid—

    (A) after the mailing of the notice of deficiency, or

    (B) within the period which would be applicable under section 6511 (b)(2), (c), or (d), if on the date of mailing of the notice of deficiency a claim had been filed (whether or not filed) stating the grounds upon which the Tax Court finds that there is an overpayment.

claim rests upon statutory provisions defining claims for refund of income taxes, and the statutory limitations for asserting those claims are to be found in sections 6511 and 6512 and not in that statutory provision governing claims upon a check or warrant issued by the Government.

However, petitioners' claim for interest on the overpayment from date of filing of the return for 1954 is beyond our authority to consider. We express no opinion as to whether interest is to be computed by reference to the purported date of issuance of the check which petitioners never received. Cf. *Dresser* v. *United States*, 180 F. 2d 410 (C.A. 10, 1950).

*Decision will be entered under Rule 50.*