**UNITED BENEFIT LIFE INSURANCE COMPANY, a corporation, Plaintiff,**

v.

**James L. McCRORY, Defendant.**

**Civ. No. 0922.**

United States District Court
D. Nebraska.

June 30, 1965.

Joseph Vinardi, William Day, Don Evans, Omaha, Neb., for plaintiff.

Dale Anderson, Department of Justice, Washington, D. C., for defendant.

ROBINSON, Chief Judge.

This action was instituted by the United Benefit Life Insurance Company, a corporation, for recovery of $246,569.66 in income tax and interest paid by it for the years 1954 through 1957 together with interest thereon as provided by law and its costs.

This Court has jurisdiction pursuant to Title 28, United States Code, § 1340.

There are a number of issues to be resolved in this case, each of which will be separately resolved.

■ As part of its investment portfolio, the plaintiff purchased certain mortgage contracts during the years in question. Some of these contracts were purchased at a premium, some at a discount, and some at par value. The plaintiff contends that amounts paid by it in excess of the face amounts of certain of these mortgages were properly treated by it as payments for the preferred nature and quality of the indebtedness and, therefore, as direct reductions of interest on mortgages in accord with its practice of treating discounts as direct increases of interest on mortgages. The Government contends that these amounts were not true premiums but were in the nature of "finders" fees or loan origination fees paid by the plaintiff to the broker or correspondent from whom it acquired the indebtedness and were therefore required to be treated as part of general investment expenses.

We find that the evidence adequately shows that the prices paid for mortgage contracts by the taxpayer were determined solely by the opinion of the taxpayer as to market value. The changing pattern of the market is shown by a gradual shift in taxpayer's purchases from no discount purchases in 1954, with most being bought at a premium to a majority of contracts in 1957 being purchased at a discount. This evidences the reliance placed on market value by the taxpayer and tends to show that loan origination fees were not being paid.

It is true that on direct purchases, work was done by employees of the taxpayer and charged to investment expenses. But this has no bearing on the treatment to be given to purchases via some other method such as a broker, as here.

The typical mortgage loan servicing contract provides that the "Seller's compensation therefor is included in the purchase price of, or in both the purchase price of and commission or other compensation for such mortgages—", but we believe that this refers to the fact that a correspondent must make any possible profit from the transaction from the bid price as made. If the bid price is too low, the broker will either make no money at all or might refuse to sell. This doesn't change the ultimate fact that the taxpayer made these investments after a study of the market value of the contract and a subsequent bid in relation to the ascertained market value. Any contracts purchased at more than the face amount were purchased at a premium and deserve to be so treated with respect to the

income tax. Thus the taxpayer was correct in reducing gross income because of the premiums paid.

■ We cannot agree, however, that taxpayer's practice of amortizing the entire premium and accruing the entire discount in one year was correct. We shall pretermit a determination of the number of years over which the amortization and accrual should extend, allowing the parties to negotiate this question prior to the entry of judgment. If the parties are unable to come to an agreement on this point, we shall, upon a proper showing by the parties, determine the number of years over which the amortization and accrual should have been made. Of course, both amortization of premiums and accrual of discount will have to be considered in any recomputation that is made.

The next question to be considered is the status of certain reserves set aside by the taxpayer for payment of claims for permanent and total disability under health and accident policies. The taxpayer has established reserves from which to make payments on future unaccrued claims for disabilities that have already occurred. These reserves are computed by using mortality tables dealing with disabilities and are computed with an assumed rate of interest. The purpose of these reserves is apparently to have enough money to make payments on these already established claims as they accrue in the future. The amount of money in the reserves is computed by discounting the amounts expected to be paid in the future to the present time.

The taxpayer contends that these reserves are given the status of "life insurance reserves" under section 803[b] of the original 1954 Code of Internal Revenue and section 801[b] of the 1954 Code as amended [Life Insurance Company Tax Act for 1955]. Those sections define life insurance reserves as "amounts which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts [including life insurance or annuity contracts combined with noncancellable health and accident insurance] involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies", and which are with certain exceptions not relevant here, "required by law".

In this litigation, the only question we must determine is whether or not the policies in question are "noncancellable health and accident insurance contracts" under these statutes. The other requirements have been adequately established or admitted [although the defendant's concession that the claims provided for by the reserves are "future unaccrued claims" is for the purposes of this case only]. It is also necessary in this connection to determine whether these reserves were established for claims arising under noncancellable health and accident insurance contracts.

A review of the purpose behind allowing special treatment to those reserves given the status of "life insurance reserves" by statute is in order. A life insurance contract normally requires premium payments that remain level throughout the duration of the contract. Obviously, however, the risk of loss under such contracts is not as great during the earlier years of the policy as it is later when the insured approaches the time when payment under the contract will become due. The premiums charged are therefore at a rate which is in excess of the actual cost of carrying the insurance for the earlier years. This excess amount is then placed in reserve to make up the difference in later years between the level premium payments and the increased cost occasioned by the greater risk incurred by the insurer. This reserve is set up to meet the obligation created by the contract to maintain level premium rates. It is this type of reserve which Congress intended to receive the specialized treatment.

It may be noted that noncancellable health and accident insurance contracts have the same basic characteristic in this respect that life insurance contracts have. In other words, the level premium rate obligation requires a reserve to be established out of the excess payment in earlier years to meet the increased cost above the premium rate in later years. Without the noncancellable feature, this type of policy is simply non-renewable and rates can be increased from year to year, thus obviating the necessity of the type of reserve we are concerned with here. Massachusetts Protective Life Ass'n v. United States, 114 F.2d 304 [1st Cir., 1940]. See also Commissioner of Internal Revenue v. Monarch Life Ins. Co., 114 F.2d 314 [1940]; Equitable Life Assurance Society, 33 B.T.A. 708 [1935].

The legislative history with respect to Congressional intent is also interesting. Section 201[c] [2] of the Internal Revenue Code as amended by the Revenue Act of 1942 also includes amounts set aside for claims arising from noncancellable health and accident insurance contracts within the meaning of "life insurance reserves." The following pertinent statement is found in H.Rep.No. 2333, 77th Cong., 1st [sic] Sess., [1942–2 Cum.Bull. 372, 453–454]:

"The life insurance reserves defined in subsection [c] [2] as they pertain to noncancellable health and accident insurance policies are those amounts which must be reserved, in addition to pro rata unearned premiums, to provide for additional cost of carrying such policies in later years when the insured will be older and subject to greater risk and when the cost of carrying the risk will be greater than the premiums then being received. As the term is used in the industry, a noncancellable insurance policy means a contract which the insurance company is under an obligation to renew at a specified premium, and with respect to which a reserve in addition to the pro rata unearned premium must be car-

ried to cover the renewal obligation. * * * "

See also, to the same effect, S.Rep.No. 1631, 77th Cong., 2d Sess., [1942–2 Cum. Bull. 504, 611–612].

■ A noncancellable insurance policy must therefore be one under which the insurance company is obligated to continue or renew at a specified premium and with respect to which a reserve must be carried in addition to the unearned premium to meet the obligation. 26 C.F.R. 1.801.

Some of the foregoing authorities were not effective at the relevant dates herein, but we consider them to be quite persuasive since they deal directly with the question in issue.

Typical policies offered and issued by the taxpayer were received into evidence at the trial of this case. Each of the policies provides for a waiver of premium under certain specified conditions and each contains a provision that the policy is renewable at the option of the company. None of the policies contains standard provision number 16, which is the standard provision in the insurance industry providing that the policy may be cancelled at any time within five [5] days notice with certain exceptions thereto.

The taxpayer contends that the absence of standard provision 16 shows that the policy is noncancellable. This is an obvious *non-sequitur*. There are other provisions in the policy providing that renewal is at the option of the company. Obviously, at each renewal date the contract can be cancelled. The absence of standard provision 16 proves nothing with respect to whether the policy is noncancellable. The remainder of these typical policies adequately establishes that these policies are in fact cancellable at their inception within the meaning of the statutes in question. A noncancellable policy, must, at its inception, specify and guarantee what the future years' premiums will be. The only way the typical policies could approach the status of noncancellability would be

by having an initial term of several years or more. This provision is not present in any of the policies introduced into evidence.

In an explanatory note to its income tax returns for the years 1954, 1955, 1956 and 1957 the plaintiff taxpayer states that the great majority of health and accident policies of the company provide that on each premium due date the acceptance of the premium then due, and, consequently the continuance of the policy, is optional with the taxpayer. These policies are acknowledged to be cancellable, prior to the occurrence of a claim, but the taxpayer contends that once a claim is incurred, the policy becomes a noncancellable contract with respect to the payment of the claim. The note further states that many are claims for future disability income payments and the majority of such claims are for lifetime indemnity; that is, monthly disability payments are made as long as the insured survives and continues disabled, and that a smaller number are payable for limited periods of 24 months to 100 months subject to continuance of disability. It is explained that the reserve for such a claim is the present value of future payments computed according to a disabled life mortality table and an assumed rate of interest in the same manner as the reserve of disability income claims under life insurance policies, and that it would appear to be the intent of the statute, therefore, to permit such loss reserves to be classed as life insurance reserves and that such reserves have thus been included in life insurance reserves.

■ Noncancellable health and accident insurance contracts have premium rate and renewability guaranteed at the inception of the contract. This necessitates setting aside a reserve in the earlier years of the policy to provide for increasing risks in the later years of the policy. It is this factor which makes them similar to life insurance contracts and it is this reserve which Congress had in mind when it authorized amounts to be set aside for claims under noncancellable health and accident insurance contracts to be considered as statutory life insurance reserves.

The difference between active life reserves and disabled life reserves was pointed out at the trial by Richard W. Erdenberger, an actuary for Mutual of Omaha. He stated that active life reserves are established through excess premium payments in the early years of the policy to offset increased risks in later years at the same premium rate. Disabled life reserves are set aside after the contingent disability has occurred to meet future unaccrued payments that will fall due as the disability continues. Both involve mortality or morbidity tables and have an assumed rate of interest.

■ We find, in light of the foregoing, that the reserves established by the taxpayer are disabled life reserves that do not arise from noncancellable health and accident insurance contracts and are thus not entitled to be considered as life insurance reserves. It is only those policies which require an active life reserve that may claim this favored statutory tax treatment. The noncancellability of the contracts after the disability has occurred has no effect on the fact that the policies taken as a whole and from their inception were cancellable. It is also true that the reserves here in question are not the type envisioned by Congress when the applicable statutes were passed.

Plaintiff also contends that for the year 1954 its assets and income were subjected to an unlawful double taxation consisting of a tax imposed upon actual net investment income from all sources compounded with a tax upon a portion of the reserves other than life insurance reserves established by it. Plaintiff has not made a convincing showing regarding this contention, and we decide adversely thereto.

Finally we consider questions relating to prepayment penalties for the year 1954. Plaintiff argues that prepayment penalties for paying off the balance of a mortgage before the due date were not mentioned in the law relating to 1954, but that they were mentioned in the law relating to the subsequent years;

that the House Ways & Means Committee in H.R.Rep.No.1098 84th Cong. 2d Sess. [1956] U.S.Code Congressional and Administrative News, p. 2253 stated that the old definition found in the 1954 Code had "been expanded by including * * * certain amounts received in connection with entering into, altering, or terminating agreements such as leases and mortgages" which "are considered similar to income received under the agreements" and "would include, for example, a bonus on entering into a lease and a penalty for early repayment of a mortgage," and that therefore penalty prepayments were not taxable for the year 1954.

■ The contention of the taxpayer is interesting but we find it to be erroneous. Prepayment penalties are actually additional fees for the use of the lender's money for a shorter period of time than the original agreement. They represent a recognition of the fact that a loan for a shorter period of time generally has a higher cost than a loan for a longer period of time. Thus the borrower is forced to make payments tending to equalize the difference between the shorter term loan effectively made so by the prepayment and the longer term loan the parties agreed on. Whatever the explanation, the penalty must be considered to be additional fees, or interest for the use of money and thus taxable. Equitable Life Assurance Soc. of U. S. v. United States, Ct.Cl., 181 F.Supp. 241 [1960]. For similar reasoning see General American Life Insurance Co., 25 T. C. 1265 [1956] and Prudential Insurance Company of America v. United States. Ct.Cl., 319 F.2d 161 [1963]. The fact that these penalties were specifically included in income in a later statute must be regarded as a clarification of the law rather than a change in previously existing law. Prepayment penalties are thus taxable for the year 1954.

Evidence at the trial showed that these penalties had been included as part of interest income by the taxpayer for the years 1955 to 1957. There was no showing as to 1954 in this regard. The Government contends that the taxpayer must show that these payments were reported in 1954 under pain of having any tax attributable thereto deducted from any refund to which the taxpayer may be entitled in this case.

■■ When a refund claim based on a particular deduction is made, the Commissioner of Internal Revenue has authority to reaudit the return and to reject the claim on the basis of the disallowance of another deduction even though the statute of limitations would prevent him from making an additional assessment for the year involved. Refunds are limited to overpayments. The taxpayer must establish that an overpayment has been made and that the Government is thus holding money belonging to the taxpayer. The burden is thus on the taxpayer to make a showing as to any issues that may develop with respect to the tax return for the year in question. If there has not been an overpayment considering the tax return as a whole after a reaudit, then the taxpayer may not gain a recovery. Lewis v. Reynolds, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 [1932].

We find that it is incumbent upon the taxpayer to establish that it inc'uded in its return for the year 1954 any prepayment penalties which it may have received in the year 1954. If it should be determined that the taxpayer is entitled to a refund attributable to the deduction of premiums [as explained above], the parties may then negotiate the question of whether prepayment penalties were included in the 1954 return. If the parties are unable to come to an agreement on this point, we shall determine the question upon a proper showing of the parties.

The foregoing shall constitute findings of fact and conclusions of law under Rule 52[a] of the Federal Rules of Civil Procedure. Counsel for the defendant will prepare and submit a form of Judgment within thirty [30] days after the resolution of the questions regarding amortization of premiums and accrual of discount and the inclusion of prepayment penalties in the 1954 return.