The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

No. 89–1259.

United States Court of Appeals, Third Circuit.

Argued July 25, 1989.

Decided Aug. 22, 1989.

---

States Tax Court decision. The sole issue presented is whether receipt by an insurance company of prepayment charges upon the retirement of certain corporate mortgages should be characterized as long-term capital gain excluded from "gross investment income" within the meaning of section 804(b) of the Internal Revenue Code. The Tax Court held that the prepayment charges should not be characterized as capital gain and therefore should not be excluded from "gross investment income." We will reverse the Tax Court's determination.

## I. *BACKGROUND*

All of the relevant facts have been stipulated. The Prudential Insurance Company of America, taxpayer, is a mutual life insurance company incorporated under the laws of the State of New Jersey. It timely filed its federal income tax returns for 1972 and 1973, the years in issue, with the District Director in Newark.

The controversy revolves around loans made by the taxpayer. As part of its regular investment activities, the taxpayer made mortgage loans secured by real property to corporate and noncorporate borrowers. These mortgages generally contained provisions allowing the borrowers to prepay the obligations prior to the scheduled maturity dates if the borrowers agreed to also pay a specified amount in excess of the loan principal ("prepayment charge") plus any unpaid interest accrued to the date of retirement of the obligation.

The loans at issue were not made by the taxpayer at an amount above (premium) or below (discount) their principal amount. They were not issued with an intention to redeem the obligations prior to maturity. The taxpayer was not a dealer in corporate mortgages. The prepayment charges were normally specified in advance of the issuance of the mortgage, but in some cases, the prepayment charges were negotiated between the taxpayer and the debtor immediately prior to the retirement of the loan.

Michael F. Kelleher (argued), Irene Price, and Kathleen M. Niles, Groom and Nordberg Chartered, Washington, D.C., for appellant (Michael R. Chesman and Terry J. Hartzel, Prudential Ins. Co. of America, of counsel.)

James I.K. Knapp, Acting Asst. Atty. Gen., Gary R. Allen, Chief Appellate Section, Robert S. Pomerance, and Robert W. Metzler (argued), Attys. Tax Div., Department of Justice, Washington, D.C., for appellee.

Before GIBBONS, Chief Judge, and HUTCHINSON, Circuit Judge, and WOLIN, District Judge.*

## OPINION OF THE COURT

GIBBONS, Chief Judge:

The Prudential Insurance Company of America appeals from an adverse United

* Honorable Alfred M. Wolin, United States District Judge for the District of New Jersey, sitting by designation.

Typically, the prepayment charges on the mortgage obligations were fixed on a sliding scale that decreased over time.

On its federal income tax returns for 1972 and 1973, the taxpayer treated the gain from prepayment charges on corporate mortgages issued after December 31, 1954, and held for more than six months as long term capital gain as defined in Code Section 1232(a)[1] and as such, excluded these amounts from "gross investment income" under section 804(b). The taxpayer conceded that the prepayment charges on mortgage loans to noncorporate borrowers or the prepayment charges on any mortgage made before January 1, 1955 should be treated as "gross investment income" under section 804(b).

Upon audit, the Internal Revenue Commissioner disagreed with the contention that prepayment penalties on corporate mortgages may be treated as long-term capital gain and excluded from gross investment income under section 804(b). The Commissioner issued an income tax deficiency notice based upon the treatment of all mortgage prepayment penalties as gross investment income. The taxpayer filed a petition with the Tax Court for review of his determinations.

■ The Tax Court upheld the Commissioner's deficiency determination. Payments which are in reality interest substitutes or equivalents do not receive capital gain treatment. *See United States v. Midland–Ross Corp.*, 381 U.S. 54, 85 S.Ct. 1308, 14 L.Ed.2d 214 (1965) (earned original issue discounts are interest equivalents, not capital gains). Following the *General*

1. § 1232. Bonds and other evidences of indebtedness

(a) General rule.—For purposes of this subtitle, in the case of bonds, debentures, notes or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or by any government or political subdivision thereof—

(1) Retirement.—Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954).

(2) Sale or exchange.—

(A) Corporate bonds issued after May 27, 1969.—Except as provided in subparagraph (C), on the sale or exchange of bonds or other evidences of indebtedness issued by a corporation after May 27, 1969, held by the taxpayer more than 1 year, any gain realized shall (except as provided in the following sentence) be considered gain from the sale or exchange of a capital asset held for more than 1 year. If at the time of original issue there was an intention to call the bond or other evidence of indebtedness before maturity, any gain realized on the sale or exchange thereof which does not exceed an amount equal to the original issue discount (as defined in subsection (b)) reduced by the portion of original issue discount previously includible in the gross income of any holder (as provided in paragraph (3)(B)) shall be considered as ordinary income.

(B) Corporate bonds issued on May 27, 1989, and government bonds.—Except as provided in subparagraph (C), on the sale or exchange of bonds or other evidences of indebtedness issued by a government or political subdivision thereof after December 31, 1954, or by a corporation after December 31, 1954, and on or before May 27, 1969, held by the taxpayer more than 1 year, any gain realized which does not exceed—

(i) an amount equal to the original issue discount (as defined in subsection (b)), or

(ii) if at the time of original issue there was no intention to call the bond or other evidence of indebtedness before maturity, an amount which bears the same ratio to the original issue discount (as defined in subsection (b)) as the number of complete months that the bond or other evidence of indebtedness was held by the taxpayer bears to the number of complete months from the date of original issue to the date of maturity,

shall be considered as ordinary income. Gain in excess of such amount shall be considered ordinary income held more than 1 year.

(C) Exceptions.—This paragraph shall not apply to—

(i) obligations the interest on which is not includible in gross income under section 103 (relating to certain governmental obligations), or

(ii) any holder who has purchased the bond or other evidence of indebtedness at a premium.

(D) Double inclusion in income not required.—This section shall not require the inclusion of any amount previously includible in gross income....

I.R.C. 1954 § 1232, repealed Pub.L. 98–369, Title I, § 42(a)(1), July 18, 1984, 98 Stat. 556.

*American* line of precedent,[2] the Tax Court determined that prepayment charges constitute interest substitutes or additional fees for the use or forbearance of money. We disagree.

## II. *PREPAYMENT CHARGES ON CORPORATE MORTGAGES REPRESENT CAPITAL APPRECIATION, NOT INTEREST*

The reasoning underlying the Tax Court's decision and the precedents which it relied upon[3] is that the prepayment charge for the early retirement of a mortgage is additional interest to make up the higher interest charge which is generally charged on short-term as opposed to long-term obligations. Thus, the treatment of prepayment charges as interest equivalents depends upon the misconception that interest rates on short-term mortgages are higher than interest rates on long-term mortgages.

In reality, the converse is true. Interest rates on long-term obligations are generally higher than interest rates on short-term obligations. A lender will generally charge his cost of capital plus a premium for use of the money. The premium is directly related to the risk involved in making the loan which, all other factors being equal, is less in the shorter period. Financial solvency is easier to predict over shorter periods. The lender's cost of capital is also more easily predicted over a shorter period of time. Short-term obligations are more liquid than long-term obligations because by definition, the capital is committed for a shorter period. These factors combine to create higher interest rates on longer-term obligations.

The Tax Court held that prepayment charges are additional interest charges paid because the borrower shortened the term of the loan and shorter-term loans have higher interest rates. The Tax Court's decision is in direct conflict with the stipulations entered into by the Commissioner of the Internal Revenue Service and the taxpayer. Stipulation 50 reads: "Historically, it has been most common for long-term interest rates to exceed short-term interest rates." (A. 34).

In the present case, the stipulations not only provide the facts that this court must accept but they also provide a review of financial theory necessary to understanding the operation of prepayment charges:

### MARKET INFORMATION

42. All other things being constant, the price at which a debt instrument with a fixed rate of interest may be purchased will rise and fall as the prevailing level of interest rates fluctuates. The price will increase when interest rates on instruments of similar credit risks decline. The price will decline when interest rates on instruments of similar credit risks increase. The price changes will be more pronounced if the debt instrument has no prepayment privilege.

43. The hypothetical Debt Instrument, which is the subject of paragraphs 44 through 47, has the following characteristics:

a. The instrument was issued for the principal amount (i.e., there is no original issue discount).

b. The instrument has a fixed interest rate.

c. The maturity date is fixed.

d. There is no provision permitting prepayment.

44. As the prevailing market interest rate increases above the stated rate in

**2.** *See General American Life Ins. Co. v. Commissioner,* 25 T.C. 1265 (Tax Ct.1956); *Equitable Life Assurance Society of the United States v. United States,* 149 Ct.Cl. 316, 181 F.Supp. 241, 243 (1960), *cert. denied,* 364 U.S. 829, 81 S.Ct. 68, 5 L.Ed.2d 56; *United Benefit Life Ins. Co. v. McCrory,* 242 F.Supp. 845, 851 (D.Neb.1965), *aff'd on other grounds,* 414 F.2d 928 (8th Cir. 1969).

**3.** *See, e.g., Equitable Life Assurance Society of United States,* 149 Ct.Cl. 316, 181 F.Supp. at 242 (1960) ("prepayment charges are in reality an additional fee for the use of the lender's money for a shorter period of time than originally agreed upon, and that this fee represents the generally higher cost of a short-term, as opposed to a long-term loan"), *cert. denied,* 364 U.S. 829, 81 S.Ct. 68, 5 L.Ed.2d 56.

the Debt Instrument, the value of the Instrument to its holder decreases.

45. The obligor on the Debt Instrument would have no economic incentive to prepay his debt should the prevailing market rate of interest increase above the rate specified in the Instrument.

46. As the prevailing market interest rate decreases below the stated rate in the Debt Instrument, the value of the Instrument to the holder increases.

47. The obligor on the Debt Instrument would have an economic incentive to prepay his debt should the prevailing market rate of interest decrease below the rate specified in the Instrument. The obligor would be motivated to borrow funds at the lower interest rate.

48. The increase in market value of a debt instrument that would otherwise result from a fall in the prevailing level of interest rates will not be as great if, under the instrument, the obligor has the privilege of prepayment at any time without restriction.

49. The increase in market value of a debt instrument resulting from a drop in the prevailing level of interest rates will diminish as the maturity date of an instrument approaches.

50. Historically, it has been most common for long-term interest rates to exceed short-term interest rates.

51. As described in paragraph 28, a prepayment charge is an amount in excess of principal and accrued interest imposed for the right to prepay a mortgage prior to maturity.

52. Unsecured corporate debt obligations, i.e., bonds and debentures, may include provisions whereby the obligor retains the right to prepay or "call" the obligation prior to maturity.

53. If a corporate bond or debenture includes a call provision, the obligation will typically include a provision for a "call premium," which is a charge in excess of principal and accrued interest imposed for the right to retire a corporate bond or debenture prior to maturity.

54. Prepayment charges and call premiums serve the same economic function.

55. If prepayment of a debt instrument is permitted without charge, the holder of the debt instrument that is prepaid after a fall in the prevailing level of interest rates will not realize the increase in the market value of the instrument that the holder would have realized from the sale of a debt instrument with restrictions on prepayment.

56. If prepayment of a debt instrument is permitted without charge, the holder of the instrument that is prepaid after a fall in the prevailing level of interest rates will not realize the instrument's favorable interest rate (*i.e.*, the difference between the interest rate stated in the instrument and the lower prevailing market interest rate) that would have been realized if the obligation had been held to maturity and the prevailing interest rate level remained at such lower rate.

57. Prepayment charges are included in mortgages to discourage repayment of loan principal during a period when prevailing interest rates have fallen below the interest rate provided in the mortgage obligation.

58. Prepayments of mortgages increase when the prevailing level of interest rates has fallen below rates prevailing when the obligations were issued. (A. 32–33).

The value of a debt instrument varies inversely with increases and decreases in the market interest rate for instruments of similar credit risk. *See W. Meigs & R. Meigs, Financial Accounting* 488–91 (4th ed. 1983); T. Maness, *Introduction to Corporate Finance* 154–56 (1988). The value of a debt instrument equals the present value of its expected cash flows, interest payments, plus principal payments. *Id.* As market interest rates decrease, the value of the obligation increases. An instrument which is generating a higher than market income stream because its interest rates are higher than the current market rate will be more highly valued. Because this higher value depends upon the higher income stream, the value decreases as the

obligation nears maturity and the life of the income stream is reduced.

When interest rates increase relative to a debt instrument, the value of such a debt instrument decreases. The borrower realizes benefit because he is able to pay back the monetary obligation at less than the prevailing market interest rate. He receives the use of the money without bearing the current cost of borrowing.

When interest rates decrease relative to a debt instrument, whether the lender receives the benefit of the higher valued instrument depends upon the prepayment terms. If no prepayment is allowed, the lender may receive the benefit of his higher valued instrument in the form of higher than market interest receipts. Alternatively, he may sell the instrument at its appreciated value. The gain received from such appreciation upon the sale of a corporate debt instrument which is a capital asset would clearly have been treated as capital gain under section 1232. Treas.Reg. 26 C.F.R. § 1.1232–3(a)(2), ex. 1. Neither party would dispute this.

Conversely, if the instrument allows prepayment at any time without penalty, the lender will generally not receive the benefit from a significant drop in interest rates. The borrower will simply refinance the obligation at the prevailing lower interest rate. The borrower will borrow money at the lower rate and pay off the debt instrument which has the higher interest rate. The lender will not receive the higher than market interest receipts. Moreover, the lender is not able to sell the instrument at a higher value because of the probability of prepayment.

A prepayment charge is a middle course between no prepayment and prepayment at will. To a limited extent, it preserves the lender's right to receive the benefit of appreciation in value of the debt instrument resulting from a drop in the prevailing interest rates. The prepayment charge acts as a ceiling on the amount of appreciated value that the lender will receive. At the point where prevailing interest rates have dropped far enough to result in an increase in value of the instrument which exceeds the prepayment charge, the borrower will pay the prepayment charge and refinance the debt.

As previously stated, the value of an instrument with a higher than market interest rate decreases as the obligation nears maturity because there are fewer higher than market interest payments to be received. Frequently, prepayment charges decrease as an obligation nears maturity as a corollary to this fact.

Prepayment charges on corporate mortgages are the equivalent of call premiums on corporate bonds. The only difference is the nature of the two instruments: mortgages by definition are secured by real property, whereas bonds may be secured or unsecured. The Internal Revenue Service entered into a stipulation with the taxpayer that prepayment charges are the economic equivalent of call premiums on bonds. *See supra* Stipulation 54. We agree. It is curious that both the Internal Revenue Service and the Tax Court have consistently taken the position that call premiums are not interest equivalents but rather should be treated as proceeds from the exchange of bonds. *See, e.g.,* Rev.Rul. 72–587, 1972–2 C.B. 74; *Bryant v. Commissioner,* 2 T.C. 789 (1943), *acq.* 1944 C.B. 4.

We reject the Commissioner and the Tax Court's position that prepayment charges are interest equivalents. We hold that prepayment charges on corporate mortgages issued after January 1, 1955 represent amounts received in exchange for the mortgages under I.R.C. § 1232(a)(1). Accordingly, the prepayment charges at issue in the present case would generally be treated as capital gain. Nevertheless, if Congress intended to treat these payments as interest for purposes of 26 U.S.C. § 804, this congressional intent would control. This leaves us with a question which the Tax Court was not required to answer because it incorrectly determined that prepayment charges are interest equivalents: whether prepayment charges received by an insurance company which qualify for capital gain treatment under section 1232 should nevertheless be treated as interest for purposes of section 804.

III. *NEITHER THE LANGUAGE NOR THE LEGISLATIVE HISTORY OF SECTION 804 EVIDENCE A CONGRESSIONAL INTENT TO TREAT PREPAYMENT CHARGES RECEIVED BY INSURANCE COMPANIES DIFFERENTLY UNDER SECTION 804 THAN THEY ARE TREATED UNDER SECTION 1232*

In general, a prepayment charge received for retirement of a corporate mortgage issued after January 1, 1955 which is a capital asset in the hands of the holder would be an amount received in exchange for a capital asset, subject to capital gain treatment under I.R.C. § 1232(a)(1). The proper treatment under section 804(b) of such a prepayment charge is more complicated. Section 804(b) defines gross investment income for insurance companies:

(b) Gross investment income.—For purposes of this part, the term "gross investment income" means the sum of the following:

(1) Interest, etc.—The gross amount of income from—

(A) interest, dividends, rents and royalties,

(B) the entering into of any lease, mortgage, or other instrument or agreement from which the life insurance company derives interest, rents, or royalties, and

(C) the alteration or termination of any instrument or agreement described in subparagraph (B).

(2) Short-term capital gain.—The amount (if any) by which the net short-term capital gain exceeds the net long-term capital loss.

(3) Trade or business income.—The gross income from any trade or business (other than an insurance business) carried on by the life insurance company, or by a partnership of which the life insurance company is a partner. In computing gross income under this paragraph, there shall be excluded any item described in paragraph (1).

Except as provided in paragraph (2), in computing gross investment income under this subsection, there shall be excluded any gain from the sale or exchange of a capital asset, and any gain considered as gain from the sale or exchange of a capital asset.

A prepayment charge would generally be included in gross investment income by virtue of §§ 804(b)(1)(B) & (C) as part of the gross amount of income from termination of a mortgage. *See* Treas.Reg. 26 C.F.R. § 1.804–3(a)(1)(V) ("For example, gross investment income includes amounts received as ... a penalty for the early payment of a mortgage."). However, in the present context, the last paragraph would appear to exclude prepayment charges when they qualify to be treated as long-term capital gains under other code provisions. Thus, under the plain language of the statute, prepayment charges are generally included in gross investment income except when they qualify for long-term capital gain treatment.

The definition of gross investment income in section 804 was passed by Congress in the Life Insurance Company Tax Act of 1955, ch. 83, 70 Stat. 36, Sec. 2. The legislative history of this Act lists prepayment penalties on mortgages as an example of amounts to be included in gross investment income. The House Committee Report provides as follows:

E. THE DEFINITION OF INCOME

The gross income of a life insurance company under present law is defined as interest, dividends, and rents. This definition has been expanded by including (1) royalties; (2) certain amounts received in connection with entering into, altering, or terminating agreements such as leases and mortgages; and (3) income derived from the operation of a noninsurance business. Royalties are considered to be similar to rents. *Similarly, the receipts in connection with certain agreements are considered similar to the income received under the agreements.* These amounts would include, for example, a bonus on entering into a lease and a *penalty for early repayment of a mortgage.* Normally a life insurance

company will only have income from a noninsurance business where it acquires a going business in foreclosing a mortgage. Income earned in this situation is considered to be similar to mortgage interest.

The deductions corresponding to these types of income are allowed. Thus, the bill provides a deduction for depletion and a deduction for the ordinary expenses of any noninsurance business. As has always been the case, *capital gains are not included in life insurance income.*

\* \* \* \* \* \*

Subsection (b)(1) includes in the definition of "gross investment income" the gross amount of any income, received or accrued, during the taxable year, from interest, dividends, rents, and royalties. It is made clear that income includes the gross amount received in conjunction with the making of any lease, mortgage, or other instrument or agreement from which the life insurance company will derive interest, rents, or royalties, and the alteration or termination of any such lease, etc. Examples of such amounts would be a *penalty for early payment of a mortgage* and a bonus for entering into a lease. Any amount received in conjunction with an agreement which would be deemed a capital gain under other provisions of the Internal Revenue Code will not be included in gross investment income.

Under subsection (b)(2) of section 803 [subsequently 804], "gross investment income" also includes the gross income from any trade or business (other than an insurance business) carried on by the insurance company individually or in partnership. In determining the amount of income from such trade or business it is provided that any items described in section 803(b)(1) be excluded. Gross investment income does not include any gain from the sale or exchange of a capital asset. This exclusion applies also to any gain which is treated as a gain from the sale or ex-

change of a capital asset under other provisions of the Internal Revenue Code.

H.Rep. No. 1098, 84th Cong., 1st Sess., 1956–1 Cum.Bull. 954, 957, 961 (emphasis supplied). The Senate Report contains virtually identical language. *See* S.Rep. No. 1571, 84th Cong., 2d Sess., 1956–1 Cum. Bull. 967, 970, 974.

This legislative history is consistent with the position that section 804(b) requires mortgage prepayment charges to be included in an insurance company's gross investment income except when the mortgage prepayment or exchange qualifies for long-term capital gain treatment. The fact that certain prepayment penalties qualify for capital gains treatment and exclusion from gross investment income does not negate the legislative history which lists mortgage prepayment penalties as an example of gross investment income. Other, if not most, prepayment penalties still will be treated as gross investment income because they do not qualify for long-term capital gain treatment. For example, for the tax years in question, the taxpayer treated the prepayment penalties received from noncorporate borrowers as gross investment income under section 804(b). Mortgages to noncorporate borrowers do not qualify as capital assets or for capital gain treatment under section 1232.

## IV. CONCLUSION

Prepayment charges on the retirement of corporate mortgages are not interest equivalents. For the tax years 1972 and 1973, the taxpayer's receipt of prepayment charges on corporate mortgages qualify for long-term capital gain treatment under section 1232. Accordingly, these amounts are not gross investment income as defined by 26 U.S.C. § 804(b). We will therefore reverse the decision of the Tax Court.