PHOENIX MUTUAL LIFE INSURANCE CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 31993-87.        Filed March 12, 1991.

*Arthur L. Bailey, Gerald A. Kafka,* and *J. Walker Johnson,* for the petitioners.

*Diane D. Helfgott,* for the respondent.

WELLS, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for the year ended December 31, 1980, in the amount of $6,223,612.

The only issue we consider in this opinion[1] is whether "prepayment premiums" received by petitioner upon the early retirement of mortgage loans made to corporate obligors constitute long-term capital gain excluded from gross investment income under section 804(b).[2]

### FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91. The stipulations and accompanying exhibits are adopted by this reference. When the petition in the instant case was filed, petitioner, a mutual life insurance corporation, had its principal place of business in Hartford, Connecticut.

As part of its investment activities, petitioner made loans to corporate borrowers secured by mortgages on real property. Interest on the loans was payable at regular intervals during the term of the loans. The loans were made at par (i.e., face value), without premium or discount. During 1980, 13 loans to corporate borrowers secured by mortgages on real property (the mortgage loans) originated and held by petitioner were paid in their entirety prior to their scheduled maturity dates (referred to herein as prepayment). Upon prepayment, petitioner received amounts in excess of the outstanding principal balances and stated interest accrued on the mortgage loans to the date of prepayment, which amounts are referred to in the instant case as "prepayment premiums."[3]

The mortgage loans originated after 1954 and had been held by petitioner for more than 1 year at the time of

---

[1]The remaining issues in the instant case will be decided in a separate supplemental opinion.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]We recognize that the amounts received by petitioner on account of prepayment of the mortgage loans also were termed "prepayment fees" or "penalties," in addition to being termed "prepayment premiums." Our use of the term "prepayment premiums" to designate all of such amounts is for convenience only and has no substantive effect on our characterization of such amounts.

prepayment. Petitioner, moreover, expected to hold each mortgage loan until its maturity. The mortgage loans were not held by petitioner for resale. During the year in issue, money market and capital market interest rates were rising. Thus, petitioner sometimes allowed prepayment of other loans (although prepayment was not permitted by the original terms of such loans) without collecting a prepayment premium, because petitioner could reinvest the prepaid funds at higher interest rates.

Petitioner received $302,295 of prepayment premiums during the year in issue. Of that amount, $205,362 was for the separately negotiated prepayment of a single mortgage loan prior to the time that prepayment was allowed under the terms of the mortgage loan. The prepayment premiums were paid on eight of the other mortgage loans, however, pursuant to their original terms.

On its Federal income tax return for 1980, petitioner reported the entire $302,295 in prepayment premiums as long-term capital gain and excluded such amount from the computation of gross investment income under section 804(b). By contrast, petitioner reported premiums with respect to the retirement of *noncorporate* mortgage loans as gross investment income under section 804(b).

OPINION

Respondent, in his notice of deficiency, determined that the prepayment premiums constituted gross investment income under section 804(b),[4] rather than long-term capital gain, which is excluded from gross investment income under the final sentence of that provision. Recently, the treatment of prepayment premiums on corporate mortgages under section 804(b) was considered by this Court in *Prudential Insurance Co. of America v. Commissioner,* 90 T.C. 36 (1988), revd. 882 F.2d 832 (3d Cir. 1989). In reversing our holding in *Prudential,* the Third Circuit held that prepayment premiums on corporate mortgages issued after 1954 constituted long-term capital gain under section 1232, and

---

[4]Sec. 804(b), which is set forth in appendix I of this opinion, was repealed by the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 719. The operative language of the provision is, however, contained in sec. 812(d) of the Internal Revenue Code of 1986.

thus were excluded from the computation of gross investment income under the flush language of section 804(b).

Petitioner urges that we follow the Third Circuit's holding in *Prudential,*[5] and contends that the instant case is an even stronger case for capital gain treatment than was *Prudential.* Respondent urges us to adhere to our holding in *Prudential* that prepayment charges on corporate mortgage loans constitute gross investment income under section 804(b). For the reasons discussed below, we hold that the prepayment premiums in this case should be treated as capital gain. We therefore no longer will follow our opinion in *Prudential.* We primarily rest our conclusion on two considerations.

### Plain Meaning of Section 1232

First, we consider the language of section 1232 itself.[6] A literal reading of section 1232 leads us to characterize the prepayment premiums as capital gain. In *Prudential,* however, we held that the *common law* treatment of mortgage prepayment charges as "interest substitutes" precluded capital gain treatment under section 1232. 90 T.C. at 38-39. As discussed below, we now believe that we should not have characterized prepayment charges on corporate mortgage loans as ordinary income. It should be noted that the cases cited in our *Prudential* opinion with respect to the common law treatment of prepayment charges[7] did not involve or consider section 1232; the mortgages in those cases were issued prior to the 1954 enactment of section 1232; and, under the relevant pre-1954 provision, section 117(f) of the Internal Revenue Code of 1939 (the 1939 Code), only debt obligations issued with interest coupons or in registered form were eligible for statutory "sale or exchange" treatment upon retirement.[8]

---

[5]Appeal of the instant case would lie in the Second Circuit, and we therefore are not bound by the Third Circuit's holding. *Golsen v. Commissioner,* 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

[6]The relevant portions of sec. 1232 are set forth in appendix II of this opinion. Sec. 1232 was repealed by the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 556. See sec. 1271, Internal Revenue Code of 1986.

[7]Most notably, the cases discussed *infra* note 23.

[8]At common law, the "retirement" of a debt instrument is not treated as a sale or exchange. *Fairbanks v. United States,* 306 U.S. 436 (1939). Sec. 117(f) of the 1939 Code, the predecessor of sec. 1232(a)(1), supplied statutory "sale or exchange" treatment to retirements of corporate

In *Prudential,* we cited the Supreme Court's decision in *United States v. Midland-Ross Corp.,* 381 U.S. 54 (1965), for the proposition that section 1232 has no power to convert items of ordinary income into capital gain. 90 T.C. at 39. The issue in *Midland-Ross* was the character, under section 117 of the 1939 Code, of amounts representing earned original issue discount (OID)[9] received upon the sale of a debt instrument before maturity.

The taxpayer in *Midland-Ross,* conceding that the gain in question was "the economic equivalent of interest," 381 U.S. at 56, nevertheless argued that the sales proceeds must be treated in their *entirety* as "gain from the sale or exchange of a capital asset" under section 117(a)(4) of the 1939 Code. In support of its position, the taxpayer cited *Commissioner v. Caulkins,* 144 F.2d 482 (6th Cir. 1944), affg. 1 T.C. 656 (1943), in which the Sixth Circuit had held that, under section 117(f) of the 1939 Code, amounts received on *retirement* of a debt instrument are "unsusceptible of partition" into ordinary and capital components, and as long as a debt instrument is *itself* a capital asset, capital gain treatment will ensue with respect to *all* proceeds of retirement.

Finding *Caulkins* lacking in authority and support,[10] the Supreme Court in *Midland-Ross* held that earned OID is not a "capital asset" and may not be treated as gain from the sale or exchange of a capital asset even if the underlying debt instrument giving rise to the discount is a capital asset. In that regard, the Supreme Court reasoned that the

---

and governmental obligations with interest coupons or in registered form. Relevant portions of sec. 117 of the 1939 Code are set forth in appendix III of this opinion.

[9]"Earned OID" refers to that portion of the OID with respect to a debt instrument that is allocable to the time period up to the date of sale or retirement of the debt instrument, determined by ratably apportioning the OID over the period between the instrument's issue date and its stated maturity date. "Unearned OID" refers to OID that has not yet been "earned" at the date of sale or retirement, i.e., OID allocable to the period *after* such date. For example, if a debt instrument with a face value of $100, due to mature in 10 years, is issued at $80, the total OID on that instrument is $20, and if such OID is ratably apportioned over the 10-year period at the rate of $2 per year, after 3 years, the *earned* OID with respect to the instrument is $6 and the unearned OID is $14. It should be noted that, under sec. 1232(a)(3)(D)(ii) (referring to sec. 818(b)), life insurance companies are required to accrue OID in accordance with the method regularly employed by the company, if reasonable, or in accordance with Treasury regulations.

[10]The Supreme Court noted that *Commissioner v. Caulkins,* 144 F.2d 482 (6th Cir. 1944), was contrary to the view expressed in *Williams v. McGowan,* 152 F.2d 570 (2d Cir. 1945), under which the various elements of a business are treated individually (i.e., as ordinary or capital items) upon a sale of the *entire* business.

term "capital asset" is to be construed narrowly and does not include "income items."[11] The Court further noted that amounts received on *retirement* of a debt instrument (as in *Caulkins*) may not be treated more favorably than amounts received on the *actual* sale of a debt instrument (as in *Midland-Ross*).

Differences exist between section 1232 and the provisions of the 1939 Code under which *Midland-Ross* was decided. The question which the Supreme Court was called upon to decide in that case—namely, whether the proceeds from sale of a debt instrument are divisible into ordinary and capital components—is answered statutorily by section 1232(a)(2).[12] Thus, unlike section 117(f) of the 1939 Code, section 1232(a) does more than supply statutory "sale or exchange" treatment; among other things, it provides that amounts in excess of the discount for which ordinary income treatment is required "shall be considered gain from the sale or exchange of a capital asset held for more than 1 year," assuming that, as in the instant case, that the taxpayer has held the debt instrument *itself* as a capital asset for the requisite period.[13]

In our opinion in *Prudential*, we indicated that the sole purpose behind the enactment of section 1232(a)(2) was Congress' intent to *deny* capital gain treatment to certain items and to reverse the result reached in *Commissioner v. Caulkins*, 144 F.2d 482 (6th Cir. 1944). 90 T.C. at 41 n.12. The following excerpt from the legislative history of section 1232, however, indicates that Congress, in enacting section 1232 as a part of the Internal Revenue Code of 1954 (the 1954 Code), certainly was aware that the provision also would *extend* capital gain treatment in certain respects:

---

[11]As an example of an "income item" excluded from the term "capital asset," the Supreme Court in *United States v. Midland-Ross Corp.*, 381 U.S. 54, 57 (1965), referred to the "proceeds of the sale of an orange grove attributable to the value of an unmatured annual crop."

[12]The taxpayer in *Midland-Ross* recognized that sec. 1232(a)(2) did in fact answer that question, sec. 1232(a)(2) having been enacted by the time the case was decided. The taxpayer thus argued that sec. 1232(a)(2) served as proof that *prior* administrative and legislative history extended capital gain treatment to realized original issue discount. The Court was unpersuaded by such argument.

[13]In the instant case, the facts clearly indicate that the mortgage loans were capital assets in petitioner's hands. The parties have stipulated that all the mortgage loans were held by petitioner for over 1 year and respondent has conceded that, at the time they were issued, there was no intention to call the mortgage loans prior to maturity.

This section is derived from section 117(f) of present law which treats redemption as a sale or exchange in the case of bonds or other evidences of indebtedness issued by a corporation (including any government or political subdivision thereof), which are in registered form or which have coupons attached.

Paragraph (1) restates the content of present law. For bonds or other evidences of indebtedness issued after December 31, 1954, *the bill abandons present restriction of capital treatment on retirement to bonds and other evidences of indebtedness which have interest coupons attached or which are in registered form. Redemption of all bonds and other evidences of indebtedness will receive capital gain or loss treatment on redemption if issued after December 31, 1954,* and if they are otherwise capital assets, except to the extent that the recovery of issue discount is subject to paragraph (2).

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

Section 117(f) does not itself extend capital-gain treatment to any transaction but simply provides one of several requirements for such treatment on retirement of certain securities. *Paragraph (2) of this section, however, provides specifically for capital-gain treatment,* and, therefore, the phrase is inserted in the first sentence of this section to the effect that this section only applies to bonds and other evidences of indebtedness which are capital assets in the hands of the taxpayer. This phrase will remove from the application of this section bonds held by a dealer in such assets and also notes and accounts receivable arising from the sale of inventory or personal services by the holder which are excluded from the capital asset category by the new provision in paragraph (4) of section 1221.

[H. Rept. 1337, 83d Cong., 2d Sess. A275-A276 (1954); emphasis supplied.[14]]

Moreover, although the enactment of section 1232(a)(2) in the 1954 Code appears primarily to have been concerned with the treatment of OID, the plain language of section 1232(a)(2) applies to prepayment premiums received on the retirement of obligations issued at face value, as well as obligations issued at a discount.[15]

---

[14]In the instant case, sec. 1232(a)(2)(B) literally applies to the mortgages issued on or before May 27, 1969. The clear predecessor of sec. 1232(a)(2)(B) is sec. 1232(a)(2)(A) as enacted in 1954. Under these circumstances, it is appropriate to consider the 1954 legislative history.

[15]Congressional understanding that sec. 1232(a)(2), as originally enacted, had the ability to confer capital gain treatment on amounts received in exchange for nondiscounted obligations is supported by the application of the de minimis rule of sec. 1232(b)(1) (1954). The following passage from the 1954 Senate Report describes such application:

Paragraph (b)(1) provides a definition of the term "original issue discount." The original issue discount means the difference between the issue price and the stated redemption price at maturity. * * * A de minimis rule is provided that if this original issue discount does not exceed one-fourth of 1 percent (as compared with the House provision of one-tenth of 1 percent), times the number of full years to maturity, then *the discount will be considered to be zero for the purposes of this section.* A 10-year bond sold initially at 97½ would not give rise

Thus, although the mortgages in the instant case were issued at face value, we believe that the prepayment premiums constitute long-term capital gain under the literal language of section 1232(a)(2)(A), in the case of those mortgages issued after May 27, 1969, and section 1232(a)(2)(B), in the case of the remaining mortgages.[16]

### Treatment of Premiums Upon Early Redemption of Debt Instruments

The second consideration we address in support of our conclusion is derived from *Bolnick v. Commissioner,* 44 T.C. 245 (1965), in which we held that redemption premiums allocable to *"unearned OID"* should be treated as capital gain, where, at the time of issuance, the issuers did not intend to redeem the obligations prior to maturity.[17] We find no logical reason for extending capital gain treatment to redemption premiums allocable to unearned OID, as we did in *Bolnick,* but not to premiums in excess of face value. In addressing the treatment of the redemption proceeds in *Bolnick,* we reasoned that:

---

to any calculations under this subsection, *and any gain realized by holders of the bond would be capital gain if the bond was a capital asset in their hands.* [S. Rept. 1622, 83d Cong., 2d Sess. 435 (1954); emphasis supplied.]

A similar example is contained in the House Report. See H. Rept. 1337, 83d Cong., 2d Sess. A277 (1954).

The definition of OID under sec. 1232(b)(1), discussed above, was made applicable by its terms "for purposes of subsection (a)," and the defined term appeared only in subsec. (a)(2)(A), the provision providing capital gain treatment for gain in excess of OID. The conclusion reached in the above-quoted example, and the statutory construction itself, thus indicate that sec. 1232(a)(2)(A), as enacted in 1954, was to have operative effect, and the ability to confer capital gain treatment, even when the *amount* of OID was zero. We are therefore not persuaded to reach a contrary conclusion with respect to face value obligations by statements in the 1954 committee reports that subsec. (a)(2) of sec. 1232 "relates only to bonds which are issued at a price which is less than the redemption price." S. Rept. 1622, *supra* at 434; H. Rept. 1337, *supra* at A276.

It should be noted that our application of the plain language of sec. 1232(a)(2) to the prepayment premiums in the instant case is but one of the considerations leading us to our conclusion.

[16]Sec. 1232, *as originally enacted, required that earned OID be included as ordinary income* by the holder of the obligation only at the time of *retirement* of the obligation. As part of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, Congress amended sec. 1232 so as to require *current* ratable inclusion of OID by the holder of an obligation. Thus, for obligations issued after the effective date of the 1969 legislation, gain recognized upon retirement does not include amounts attributable to such earned OID, the prior reporting of which already has increased the holder's basis in the obligation. See also sec. 1232(a)(3)(D)(ii) (referring to sec. 818(b)); sec. 1.818-3, Income Tax Regs. (special rules regarding accrual of discount and accompanying basis adjustments for obligations held by life insurance companies).

[17]Cf. *Leavin v. Commissioner,* 37 T.C. 766 (1962).

It is difficult to say just what the amount representing the unearned portion of the discount was paid for. A part of it could be said to have been paid for the privilege of retiring the debentures before maturity, or a part of it might be said to represent a share of the profit realized on a successful venture, equivalent to the return on liquidation of risk capital. But absent some compelling reason to liken it to ordinary income, we need not characterize it specifically because section 1232(a)(1) does characterize it as amounts received in exchange for the debentures, and hence capital gain.

This conclusion does not do violence to the concept of limiting capital gains treatment to "situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year." *Commissioner v. Gillette Motor Co.,* 364 U.S. 130, 134 (1960). Petitioner received a return of his investment plus a gain sooner than he expected due to the fortuitous circumstance that the projects were completed and marketed successfully earlier than expected and the issuers wanted to get their money out for other uses as soon as possible. Such circumstances often produce appreciation in value of assets which, if held for more than 6 months before realization of the gain, produce long-term capital gains.
[44 T.C. at 256; fn. ref. omitted.]

Although section 1232(a)(2) was not applicable to the debentures in *Bolnick*, which were issued in 1953, we noted that our conclusion was in accord with section 1232(a)(2), which "specifically answered" the question at issue.[18] *Bolnick v. Commissioner, supra* at 256. In contrast, we found that the question was *not* answered by the Court in *Midland-Ross. Bolnick v. Commissioner, supra* at 253.

*Bolnick* differs from the instant case in that the debentures in *Bolnick* were issued at a discount and *redeemed* at face value; thus, a portion of the redemption proceeds consisted of "unearned OID." In the instant case, by contrast, the mortgage loans were *issued* at face value, and the prepayment premiums consisted of amounts *in excess of face value* rather than OID. We believe that such a distinction, however, is not persuasive.

Other long-standing authorities treat "call" or "redemption" premiums on bonds as capital gain. In *District Bond Co. v. Commissioner,* 1 T.C. 837 (1943), we held that

---

[18]It should be noted that sec. 1232(a)(2) specifically denies capital gain treatment to amounts representing unearned or unaccrued OID received on the retirement of obligations issued with an "intention to call" before maturity. Such unfavorable treatment of obligations issued with an intention to call before maturity clearly confirms Congressional understanding that other amounts paid on redemption before maturity may be treated as capital gain under sec. 1232(a)(2).

premiums paid upon the redemption of bonds before maturity (which represented amounts in excess of accrued interest on the bonds) should be treated as capital gain, stating:

> Nor may we regard as interest the additional amounts received upon the redemption of bonds prior to maturity. Upon the retirement of bonds at a price in excess of cost, the resulting profit is treated for Federal income tax purposes as capital gain. Section 117(f) of the 1938 Act. * * * It was not compensation paid for the use of borrowed money, but was in effect a bonus or premium for the premature relinquishment of the obligation in order that the debtor might be relieved of the obligation to pay interest in the future. [1 T.C. at 840; citation omitted.]

Accord *Bryant v. Commissioner*, 2 T.C. 789, 794 (1943).[19] Respondent also has ruled[20] that premiums received on the redemption of bonds prior to maturity should be treated as capital gain. Rev. Rul. 60-37, 1960-1 C.B. 309, 310 ("That part of the redemption value which represents 'premium' paid by the corporation because of calling the bonds prior to maturity is long-term capital gain"); Rev. Rul. 72-587, 1972-2 C.B. 74, modified in Rev. Rul. 80-143, 1980-1 C.B. 19 (redemption premiums on municipal bonds); G.C.M. 39309 (May 31, 1984) (call premiums on debentures issued at face value).[21]

In *12701 Shaker Boulevard Co. v. Commissioner*, 36 T.C. 255 (1961), which dealt with the timing of deductibility of prepayment premiums on mortgage loans, we noted that:

> We see no distinction between a *premium* paid to retire a bond issue or a mortgage loan before the maturity date, and a *penalty* paid by the obligor for the very same privilege, i.e., early retirement of the obligation. In each instance the nature of the payment is the same. Moreover, we deem it immaterial that the penalty is the result of negotiations between the mortgagor and the mortgagee, rather than a recited penalty in the

---

[19]We note that the parties' litigating postures in *District Bond Co. v. Commissioner*, 1 T.C. 837 (1943), and *Bryant v. Commissioner*, 2 T.C. 789 (1943), were opposite to the postures herein, since the bonds in those cases were municipal bonds, the "interest" on which was tax exempt. However, the reversal of the parties' positions does not require us to apply different legal principles. *Segel v. Commissioner*, 89 T.C. 816, 826 (1987); *Ragland Investment Co. v. Commissioner*, 52 T.C. 867, 875 (1969) affd. per curiam 435 F.2d 118 (6th Cir. 1970); *Inductotherm Industries, Inc. v. Commissioner*, T.C. Memo. 1984-281, affd. without published opinion 770 F.2d 1071 (3d Cir. 1985).

[20]Respondent's rulings, however, are not precedent in this Court. *Stark v. Commissioner*, 86 T.C. 243, 250-251 (1986).

[21]See also discussion of G.C.M. 37670 and 39309, *infra* note 23.

indebtedness obligation for prior payment. [36 T.C. at 257; emphasis in original.]

Moreover, the Third Circuit in *Prudential* "agreed" with the parties' stipulation in that case that "prepayment charges are the economic equivalent of call premiums on bonds" and found it "curious that both the Internal Revenue Service and the Tax Court have consistently taken the position that call premiums * * * should be treated as [capital gain]." 882 F.2d at 837.[22]

Our conclusion in the instant case is in accord with the result reached by the Third Circuit. The Third Circuit, in reversing our decision in *Prudential,* devoted the majority of its analysis to criticizing the premise behind the cases we cited in our opinion in *Prudential* that held prepayment charges to be "interest substitutes," and apparently relied solely on section 1232(a)(1) for its conclusion. The Third Circuit reasoned:

A prepayment charge is a middle course between no prepayment and prepayment at will. To a limited extent, it *preserves the lender's right to receive the benefit of appreciation in value of the debt instrument resulting from a drop in the prevailing interest rates.* The prepayment charge acts as a ceiling on the amount of appreciated value that the lender will receive. At the point where prevailing interest rates have dropped far enough to result in an increase in value of the instrument which exceeds the prepayment charge, the borrower will pay the prepayment charge and refinance the debt. [882 F.2d at 837; emphasis supplied.]

It should be noted that the Supreme Court in *United States v. Midland-Ross Corp.,* 381 U.S. 54 (1965), specifically had declined to comment on "the tax treatment of gains properly attributable to fluctuations in the interest rate and market price of obligations as distinguished from the anticipated increase resulting from mere passage of time." 381 U.S. at 58 n. 4. Applying the above-quoted reasoning of the Third Circuit in *Prudential,* the argument that the prepayment premiums paid to petitioner in the instant case are not interest substitutes is even stronger because they were paid during a period of *rising* interest rates. We,

---

[22]See *Prudential Insurance Co. v. Commissioner,* 90 T.C. 36, 42 n.14 (1988) (citing *12701 Shaker Boulevard v. Commissioner,* 36 T.C. 255 (1961), but declining to address the treatment of call premiums).

however, do not specifically address the economic function of the prepayment premiums in the instant case, in part because the record in the instant case does not contain the extensive evidence concerning market information that was contained in the *Prudential* case.

In summary, based upon the considerations set forth above, we hold that the prepayment premiums are to be accorded capital gain treatment, and we therefore will no longer follow our opinion in *Prudential.*

*Effect of Section 804(b) on Treatment of Prepayment Premiums*

Our holding in *Prudential* that section 1232 did not apply to the mortgage prepayment charges obviated the need for us to address a second issue: namely, whether such amounts nevertheless must be included in gross investment income by reason of the specific reference to mortgage termination payments in section 804(b). The Third Circuit, however, confronted that issue, finding the treatment of prepayment charges on corporate mortgages as long-term capital gain not inconsistent with the specific language of section 804(b)(1)(C). For the following reasons, we agree with the Third Circuit's analysis of section 804(b)(1)(C).

Section 804(b)(1)(C) includes within the definition of gross investment income of a life insurance company, income from the "alteration or termination" of any mortgage from which the life insurance company derives interest. Such language first was added to the 1954 Code by the Life Insurance Company Tax Act for 1955, ch. 83, 70 Stat. 36 (1956) (the 1955 act), as part of an expansion of the definition of gross investment income of a life insurance company. Prior to the 1955 act, gross investment income of a life insurance company had been defined simply as interest, dividends, rents, and royalties.[23]

---

[23]The cases cited in our *Prudential* opinion for the proposition that mortgage prepayment charges constitute "interest," notably, *United Benefit Life Insurance Co. v. McCrory,* 242 F. Supp. 845 (D. Neb. 1965), affd. 414 F.2d 928 (8th Cir. 1969); *Equitable Life Assurance Society of the United States v. United States,* 149 Ct. Cl. 316, 181 F. Supp. 241 (1960); and *General American Life Insurance Co. v. Commissioner,* 25 T.C. 1265 (1956), dealt with the pre-1955 definition of gross investment income, and hold that prepayment charges fall within the meaning of the general term "interest." The Internal Revenue Service has confronted those cases in several General Counsel Memoranda addressing the characterization of call premiums on bonds. One General Counsel Memorandum suggests that the Revenue Rulings providing capital gain treatment for call premiums be reconsidered because of:

In expanding the definition of life insurance company investment income to include amounts such as mortgage prepayment penalties, Congress specifically noted, in legislative history as well as in the statute itself, that capital gain items would be excluded from such amounts:

Subsection (b)(1) includes in the definition of "gross investment income" the gross amount of any income, received or accrued, during the taxable year, from interest, dividends, rents, and royalties. It is made clear that income includes the gross amount received in conjunction with the making of any lease, mortgage, or other instrument or agreement from which the life insurance company will derive interest, rents, or royalties, and the alteration or termination of any such lease, etc. Examples of such amounts would be a penalty for early payment of a mortgage and a bonus for entering into a lease. *Any amount received in conjunction with an agreement which would be deemed a capital gain under other provisions of the Internal Revenue Code will not be included in gross investment income.* [H. Rept. 1098, 84th Cong., 1st Sess. (1955), 1956-1 C.B. 954, 961; emphasis supplied.[24]]

Thus, Congress undeniably was aware that other provisions of the 1954 Code might apply to confer capital gain treatment *on the very amounts being added to the list of "gross investment income,"* and chose to let those other 1954 Code provisions prevail. The expansion of the items constituting gross investment income to include mortgage prepayment charges coincided with the amendment of the statute clarifying the capital gain exclusion. Moreover, the ink barely was dry on section 1232, having been added to

our inability to find any valid economic distinction, other than the form of the debt instruments on which they are based, between call premiums and prepayment penalties on mortgages or promissory notes, which have been held to constitute interest-related ordinary income. [G.C.M. 37670 (September 8, 1978)].

In G.C.M. 39309 (May 31, 1984), however, the Internal Revenue Service adhered to its position that call premiums on bonds should be treated as capital gain, stating that "one possible explanation" for the divergent treatment of call premiums and mortgage prepayment charges is that section 804(b) should, as "the more specific section," control treatment of the latter.

As discussed below, we hold that the flush language of sec. 804(b) and sec. 1232 may be read *consistently* so as to treat the prepayment premiums as capital gain.

[24]Prior to the Life Insurance Company Income Tax Act of 1959, 73 Stat. 112 (the provisions of which apply in the instant case), life insurance companies *only* were taxed on their investment income. The legislative history of the 1959 legislation states that the definition of gross investment income in sec. 804(b) was "in substance the same" as under prior law, "except for the addition (for taxable years beginning after December 31, 1958) of the amount (if any) by which the net short-term capital gain exceeds the net long-term capital loss." H. Rept. 34, 86th Cong., 1st Sess. (1959), 1959-2 C.B. 736, 752. Accordingly, the legislative history of the 1955 act's amendment of the definition of gross investment income is relevant in construing the meaning of sec. 804(b), as applicable in the instant case.

the Code only about 1 year before. Thus, we believe that the final sentence of section 804(b) should be given effect so as to exclude the prepayment premiums which are treated as long-term capital gain under section 1232 from gross investment income. 2A Sutherland, Statutory Construction, sec. 51.02 (4th ed. 1984); *Ginsberg & Sons v. Popkin,* 285 U.S. 204, 208 (1932) ("effect shall be given to every clause and part of statutes").

Our holding that certain prepayment premiums may be *excluded* from gross investment income does not render meaningless the specific *inclusion* of such amounts in gross investment income under section 804(b)(1)(C).

As noted by the Third Circuit in *Prudential,*

The fact that certain prepayment penalties qualify for capital gains treatment and exclusion from gross investment income does not negate the legislative history which lists mortgage prepayment penalties as an example of gross investment income. Other, if not most, prepayment penalties still will be treated as gross investment income because they do not qualify for long-term capital gain treatment. For example, for the tax years in question, the taxpayer treated the prepayment penalties received from noncorporate borrowers as gross investment income under section 804(b). Mortgages to noncorporate borrowers do not qualify as capital assets or for capital gain treatment under section 1232. [882 F.2d at 839.]

The same may be said in the instant case, in which petitioner treated prepayment premiums received from noncorporate borrowers as gross investment income.[25] If such divergent treatment of prepayment premiums on corporate versus noncorporate mortgages does not seem intuitively logical, it must be recalled that such treatment is a result of the common law rule that "retirement" is not a "sale or exchange," and of Congress' decision (in the Revenue Act of 1934)[26] to single out obligations issued by *corporations* (and governments or political subdivisions) for statutory sale or exchange treatment.

For the foregoing reasons, we hold that petitioner properly excluded the prepayment premiums from its computation of gross investment income under section 804(b).

*An appropriate order will be issued.*

---

[25]Prepayment premiums on other obligations not qualifying for capital gain treatment under sec. 1232 also may be treated as gross investment income.

[26]48 Stat. 680 (1934) (original enactment of sec. 117(f)).

Reviewed by the Court.

NIMS, CHABOT, PARKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, SWIFT, GERBER, WRIGHT, PARR, RUWE, WHALEN, COLVIN, and HALPERN, *JJ.*, agree with this opinion.

---

## APPENDIX I

SEC. 804. TAXABLE INVESTMENT INCOME

(b) GROSS INVESTMENT INCOME.—For purposes of this part, the term "gross investment income" means the sum of the following:

(1) INTEREST, ETC.—The gross amount of income from—

(A) interest, dividends, rents, and royalties,

(B) the entering into of any lease, *mortgage,* or other instrument or agreement from which the life insurance company derives interest, rents, or royalties, and

(C) *the alteration or termination of any instrument or agreement described in subparagraph (B).*

(2) SHORT-TERM CAPITAL GAIN.—The amount (if any) by which the net short-term capital gain exceeds the net long-term capital loss.

(3) TRADE OR BUSINESS INCOME.—The gross income from any trade or business (other than an insurance business) carried on by the life insurance company, or by a partnership of which the life insurance company is a partner. In computing gross income under this paragraph, there shall be excluded any item described in paragraph (1).

*Except as provided in paragraph (2), in computing gross investment income under this subsection, there shall be excluded* any gain from the sale or exchange of a capital asset, and *any gain considered as gain from the sale or exchange of a capital asset.*

[Emphasis supplied.]

---

## APPENDIX II

SEC. 1232. BONDS AND OTHER EVIDENCES OF INDEBTEDNESS [1954 Code].

(a) GENERAL RULE.—For purposes of this subtitle in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, *which are capital assets in the hands of the taxpayer,* and which are issued by any corporation, or by any government or political subdivision thereof—

(1) RETIREMENT.—Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds

or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954).

(2) SALE OR EXCHANGE.—

(A) CORPORATE BONDS ISSUED AFTER MAY 27, 1969.—Except as provided in subparagraph (C), on the sale or exchange of bonds or other evidences of indebtedness issued by a corporation after May 27, 1969, held by the taxpayer more than 1 year, *any gain realized shall* (except as provided in the following sentence) *be considered gain from the sale or exchange of a capital asset held for more than 1 year.* If at the time of original issue there was an intention to call the bond or other evidence of indebtedness before maturity, any gain realized on the sale or exchange thereof which does not exceed an amount equal to the original issue discount (as defined in subsection (b)) reduced by the portion of original issue discount previously includible in the gross income of any holder (as provided in paragraph (3)(B)) shall be considered as ordinary income.

(B) CORPORATE BONDS ISSUED ON OR BEFORE MAY 27, 1969, AND GOVERNMENT BONDS.—Except as provided in subparagraph (C), on the sale or exchange of bonds or other evidences of indebtedness issued by a government or political subdivision thereof after December 31, 1954, or by a corporation after December 31, 1954, and on or before May 27, 1969, held by the taxpayer more than 1 year, any gain realized which does not exceed—

(i) an amount equal to the original issue discount (as defined in subsection (b)), or

(ii) if at the time of original issue there was no intention to call the bond or other evidence of indebtedness before maturity, an amount which bears the same ratio to the original issue discount (as defined in subsection (b)) as the number of complete months that the bond or other evidence of indebtedness was held by the taxpayer bears to the number of complete months from the date of original issue to the date of maturity,

shall be considered as ordinary income. *Gain in excess of such amount shall be considered gain from the sale or exchange of a capital asset held more than 1 year.*

[Emphasis supplied.]

---

## APPENDIX III

SEC. 117. CAPITAL GAINS AND LOSSES [1939 Code].

(a) DEFINITIONS.—As used in this title—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of

a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1);

\* \* \* \* \* \* \*

(4) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 18 months, if and to the extent such gain is taken into account in computing net income:

\* \* \* \* \* \* \*

(f) RETIREMENT OF BONDS, ETC.—For the purposes of this title, amounts received by the holder upon the retirement of bonds, debentures, notes, or certificates or other evidences of indebtedness issued by any corporation (including those issued by a government or political subdivision thereof), with interest coupons or in registered form, shall be considered as amounts received in exchange therefor.